# Exhibit "2"

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**

```
1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4   DEZSANEE JONES,                  )
                                     )
5              Plaintiff,            )
                                     )
6              vs.                   ) Case No.
                                     ) 5:22-CV-1764-SSS-SP
7   CITY OF RIVERSIDE; TAYLOR LAPOINT; )
    MIKE SMITH; and DOES 1-10,       )
8   inclusive,                       )
                                     )
9              Defendants.           )
    _____)

10

11

12

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    TAYLOR LAPOINT

16                 FRIDAY, JANUARY 6, 2023

17

18

19

20

21

22

23   Reported By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  432537
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    **Page 2**

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    DEZSANEE JONES,                      )
                                          )
5                    Plaintiff,           )
                                          )
6                    vs.                  ) Case No.
                                          ) 5:22-CV-1764-SSS-SP
7    CITY OF RIVERSIDE; TAYLOR LAPOINT;   )
     MIKE SMITH; and DOES 1-10,           )
8    inclusive,                           )
                                          )
9                    Defendants.          )
     _____)

10

11

12

13

14          The remote videoconference deposition of TAYLOR

15   LAPOINT, taken on behalf of the Plaintiff, beginning at 1:13

16   p.m., and ending at 2:57 p.m., on Friday, January 6, 2023,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2

     For the Plaintiffs:
 3
             LAW OFFICES OF DALE K. GALIPO
 4           BY:  DALE K. GALIPO, ESQ.
             BY:  HANG D. LE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           Tel:  818-347-3333
             Fax:  818-347-4118
 7           E-mail:  dalekgalipo@yahoo.com
             E-mail:  hlee@galipolaw.com
 8

 9   For the Defendants:

10           OFFICE OF THE CITY ATTORNEY-CITY OF RIVERSIDE
             BY:  DEBRA K. COOK, ESQ.
11           3750 University Avenue, Suite 250
             Riverside, California 92501
12           Tel:  951-826-5567
             Fax:  951-826-5540
13           E-mail:

14
     Also Present:  Dezsanee Jones, Judith Gallardo, Avi Melec
15   Vargas, Giana Dibernardo

16

17

18

19

20

21

22

23

24

25
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                      Page 15

```
 1      A.   I do not.

 2      Q.   Do you have any estimate as to the height or weight

 3   of the person?

 4      A.   No.

 5      Q.   Any estimate as to the age of the person?

 6      A.   No.

 7      Q.   Do you know if the person was wearing glasses or

 8   not?

 9      A.   No.

10      Q.   Anything about the person's hairstyle?

11      A.   No.

12      Q.   Did you have information related to the call that a

13   white male was the suspect?

14      A.   I did.

15      Q.   Did the person look to you to be a white male before

16   you fired?

17      A.   I don't know what that person looked like at the

18   second I breached the door.

19      Q.   Did you have information that there may have been a

20   gun involved?

21      A.   I did.

22      Q.   And a black backpack?

23      A.   I did.

24      Q.   And did you have any knowledge before getting to the

25   second floor of the apartment that a black backpack had been
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                    Page 16

```
 1   located?

 2        A.   Yes.

 3        Q.   How did you learn that?

 4        A.   As I arrived on scene I met up with my partner,

 5   Officer Smith, and we started making our way towards the

 6   apartment.  While he were walking to the apartment inside of

 7   a bush, discarded was a black backpack.

 8        Q.   And did you associate that black backpack with the

 9   call?

10        A.   It was definitely a coincidence that it was there,

11   and Officer Smith looked inside of it, and there was a

12   firearm in it.

13        Q.   So in your mind, did you think that black backpack

14   and firearm was associated with this call?

15        A.   Yes, I did.

16        Q.   And you were aware of the discovery of the black

17   backpack and the gun inside it before you got to the second

18   floor?

19        A.   That's correct.

20        Q.   Did you have any information as to whether backup

21   was on the way?

22        A.   It's -- yes.

23        Q.   What was your understanding in that regard?

24        A.   The way they dispatched the call, the call

25   specifically assigned to me and my beat partner at the time.
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 26

```
 1      A.   One time before yes, several years ago.

 2      Q.   What was the nature of that call?

 3      A.   I believe it was like domestic related, but I'm not

 4   sure.  It was more than four years ago.

 5      Q.   You don't recall the details of that call; is that

 6   fair?

 7      A.   I don't.

 8      Q.   Did you have other than it being a white male being

 9   the suspect, did you have any other additional information on

10   the suspect?

11      A.   That he was wearing a white T-shirt, black pants

12   with a backpack and was unknown to the caller.

13      Q.   Did you have anything as to age, for example?

14      A.   No.

15      Q.   When you were coming up the stairs, at some point

16   you made certain announcements; correct?  To the people or

17   person inside of 214?

18      A.   Yes.

19      Q.   And you were -- basically you were not getting a

20   response; is that generally a fair statement?

21      A.   That's correct.

22      Q.   And at some point you decided to kick the door in?

23      A.   I did.

24      Q.   Did you decide to do that, or is that recommended to

25   you to do by someone else?
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                     Page 27

```
 1              How did that occur?

 2       A.   Based on the facts that I had and the totality of

 3    the circumstances and what I heard inside the apartment after

 4    I knocked and announced as the police, I made that decision

 5    on my own.

 6       Q.   That was your own decision?

 7       A.   Yeah.  It was my decision to make, and my partner

 8    also had agreed with me.

 9       Q.   How had he agreed with you?

10       A.   After he I heard what sounded like a struggle inside

11    the apartment after we knocked and announced, I told my

12    partner, hey, we're going to have to kick the door, and he

13    said okay.

14       Q.   What did you hear regarding a struggle?

15       A.   So after I approached the apartment I kind of took a

16    second to listen to see if I can hear anything, talking,

17    movement, anything, just gathering any type of intel I can to

18    make the best decision with all the information I had.

19            I didn't hear anything, and I was just off to the

20    left of the apartment trying to stay out of that doorway,

21    knocked, announced police, three seconds I didn't hear

22    anything, I stepped back into the point of concealment that

23    I had, a little place of concealment I had, I listened, and

24    from there I heard what sounded like a struggle.

25            At the time what went through my mind was somebody
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                          Page 28

```
 1   being like held against their will, maybe making a last dash
 2   to the door, and was rolling around on the ground.  It
 3   sounded like a violent struggle.  At that point I thought the
 4   female caller who was inside was in danger.
 5        Q.   When you say making a last dash for the door, you
 6   mean, perhaps, the female victim might have been making a
 7   last dash towards the door?
 8        A.   Possibly.  Ultimately trying to get away from
 9   whoever was in the apartment and was stopped.
10        Q.   Can you hear any of those sounds of the struggle on
11   your body-worn camera?
12        A.   You can.  You can hear sounds on the body camera,
13   yes.
14        Q.   Do they sound to you like a struggle when you listen
15   to the body-worn camera audio?
16        A.   It doesn't sound the same from what I heard the same
17   day, but it does sound odd.
18        Q.   So you eventually kicked the door in; is that
19   correct?
20        A.   I made that decision eventually, yes.
21        Q.   And did you check to see where your backup was
22   before you did that?
23        A.   I partner was standing behind me, Officer Smith.
24        Q.   Smith was standing behind you when you kicked the
25   door open?
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**

Page 29

1      A.   He was about roughly four to five feet behind me

2   just off to what would be my right behind a wall.

3      Q.   How about Sklarsky, did you get an update on where

4   he was at before you kicked the door open?

5      A.   No, sir.

6      Q.   Did you ever consider it might be helpful to have

7   two officers in the area where you kicked the door open so

8   one could be cover?

9      A.   I had cover.  Officer Smith was there.

10      Q.   You believe that Officer Smith could see inside the

11   door when you kicked the door open?

12      A.   No.  Not when I was standing in front of it.

13      Q.   Right.  That's what I'm getting at.

14           Did you consider having a second officer with you in

15   front of the door so when you kicked the door open, that

16   officer would have eyes inside?

17      A.   I'm sorry.  So what you're asking me is should or

18   would I have considered Officer Smith standing directly next

19   to me as I kicked the door?

20      Q.   Or another officer, somebody --

21      A.   Anybody?

22      Q.   Somebody --

23      A.   No, not in this type of situation.

24      Q.   Why not?

25      A.   The layout of the apartment it was -- it would be

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                    Page 32

```
 1      A.   Seconds.

 2      Q.   How many?

 3      A.   One to one and a half, maybe.

 4      Q.   Okay --

 5      A.   Maybe less.

 6      Q.   Okay.  Sorry.  Did you finish?

 7      A.   Yeah.  I said maybe less.

 8      Q.   Did you say anything in that time frame from kicking

 9  the door to the firing?

10      A.   So from the time I made the decision to kick the

11  door to actually kicking the door, the door opening and then

12  me firing?

13      Q.   Yes.

14      A.   No.

15      Q.   Did you see a person at some point?

16      A.   I did.

17      Q.   And how far was that person from you when you saw

18  the person?

19      A.   Two to three feet, approximately.

20           That's best estimate.

21      Q.   Was there some light in the hallway?

22      A.   There was.  I had a light directly over me.

23      Q.   And when the door opened did some of that light from

24  the hallway go into the apartment?

25      A.   The apartment was dark.  It was just dark beyond
```

1   after the door opened.

2       Q.   I'm just wondering if some of the light from the

3   light above you in the hallway, if you know, went shined into

4   the apartment when the door was open.

5       A.   I don't recall.  It happened too fast.

6       Q.   Did you ever see the person's face before you

7   fired?

8       A.   I did not.

9       Q.   Do you know if the person was stationary or moving

10  when you fired?

11      A.   Difficult to answer.  It was such a rapidly-evolving

12  situation.  After I kicked the door in my mind I have like

13  screenshots, freeze frames of what I saw.  So whether the

14  person was actively moving after I breached the door, I can't

15  say.  It was just too fast.  I have screenshots in my mind of

16  what I saw.  That's about how I want to answer that.

17      Q.   Would it be fair to say you're not sure if the

18  person was stationary or moving?

19      A.   No.  Like I said, she could have been moving, but I

20  just had a snapshot.  She could have been stationary, but I

21  just had a snapshot of what I saw.

22      Q.   Okay.  I'm just saying you're not sure whether the

23  person was stationary or moving; is that fair?

24      A.   I'll agree with you on that.

25      Q.   Okay.  Did you see the person's left hand or arm?

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                      Page 35

```
 1   that correct?
 2        A.   Yes, that's correct.
 3        Q.   Were you stationary or moving when you fired your
 4   shot?
 5        A.   I believe I was stationary.
 6        Q.   Did you --
 7        A.   If I recall.
 8        Q.   Did you break the plane of the opened doorway at
 9   some point after kicked the door in?
10        A.   You're asking if I did I go inside the apartment?
11        Q.   Yeah.  Like if we put an imaginary line on the plane
12   of the doorway like where the door would be before you kicked
13   it, did you enter it at any point before you fired?
14        A.   No.
15        Q.   So were you outside the apartment, you believe, when
16   you fired?
17        A.   Yes, I was outside.
18        Q.   Would that include the gun wherever it was on your
19   person?
20        A.   My firearm, yes.
21        Q.   In other words, was the firearm also outside the
22   plane of the door?
23        A.   It was in my right hand, yes, or outside of the
24   door.
25        Q.   But the woman, the person you shot was inside the
```

```
 1   door when you fired; is that fair?
 2        A.   Inside of the doorway standing directly in front of
 3   the door.
 4        Q.   Did you hear any conversation like it sounded like
 5   the person might be on the phone or something at any time
 6   before you fired?
 7        A.   No, I didn't.
 8        Q.   And it sounds like you never saw a phone in the
 9   person's hands because you never saw an object or the
10   person's hands; is that correct?
11        A.   That's correct.
12        Q.   And why did you just fire one shot as opposed to
13   multiple shots?
14        A.   So we're responsible for every round that we fire.
15             After I fired that round I was able to quickly
16   reassess, and that threat was no longer a threat.
17        Q.   What did you see in your quick reassessment?
18        A.   After I fired my round -- let's me back up.
19             Stood in front of that doorway expecting an armed or
20   violent encounter on the other side of the door, with the
21   totality of the circumstances that I had, I was in fear for
22   the caller that she might be in danger.  After I kicked the
23   door my plan was to get back to my little position of
24   concealment and reassess.  As I breached the door there was a
25   person standing immediately on the other side of the door
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 37

1    with her arms outstretched in a shooting stance.

2          My thought process at that time was I accepted -- I

3    accepted the fact that I was going to be shot.  So hopefully

4    I was taking a spot that's non-fatal, get my round off first,

5    get offline, and then reassess from there.  After I fired my

6    round, got offline and reassessed, the person had moved away

7    from the doorway and the door closed.  So that threat was no

8    longer there.

9      Q.    Okay.  So I assume that you've gone to the firing

10   range with that weapon?

11     A.    I have.

12     Q.    And do you have an understanding from your

13   experience, how much shots you could fire in one second with

14   that weapon?

15     A.    Probably five or six in the second.

16     Q.    Okay.  And you only fired one shot; correct?

17     A.    That's correct.

18     Q.    And so you're saying that after you fired the first

19   shot, you realized there was no longer -- there didn't

20   continue to and exist immediate threat of death or serious

21   bodily injury; is that what you're saying?

22     A.    That's correct.

23     Q.    And I assume that you didn't continue to see this

24   person in a shooting stance?

25     A.    No.

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 44

1            I haven't read that part of Domain in a very, very

2    long time since 2014.  So I'm not exactly sure what the

3    verbiage is.

4        Q.   Do you recall there being discussion about reverence

5    for human life?

6        A.   Of course.

7        Q.   Do you recall there being discussion in the Learning

8    Domains when you went to the academy by only using deadly

9    force if no other reasonable options are available?

10       A.   Of course.

11       Q.   Okay.  Then you would agree at least based on your

12   training, to use deadly force against another human being,

13   there has to be an immediate threat of death or serious

14   bodily injury; it can't just be that you think there is a

15   potential threat.

16            I mean, you're trained that it's got to be an

17   immediate threat of death or serious bodily injury; is that

18   fair?

19       A.   It's got to be what I perceived at the time, and

20   what I perceived at the time was a threat.

21       Q.   But a threat is not enough based on your training;

22   it has to be an immediate threat of death or serious bodily

23   injury, true?

24       A.   What I saw was a 100 percent threat to my life.

25       Q.   So that's why I'm going back to my hypothetical.

1          If you kicked the door open and you see a woman

2     there, and you were not expecting a woman to be there at the

3     time, but she doesn't have a gun, and she's not in a shooting

4     stance, you would agree based on your training you can't

5     shoot her just because she happens to be there?

6          A.   I would agree if I had the time, the distance, and

7     the safety, that would probably be correct, but I didn't have

8     them.

9          Q.   All right.  I think we've been -- well, I'll go a

10    little bit longer because I think we started a little late.

11          And were you trained that you should give a verbal

12    warning when feasible before using deadly force?

13         A.   It depends.  It's -- it is -- I mean that would --

14    usually those types of deadly force scenarios usually is

15    quite obvious when deadly force was going to be used, and a

16    lot, you know, I've been in prior situations of high stress

17    where, you know, a weapon has been drawn, hey, do A, B, and

18    or you'll be shot.

19          And unfortunately, in this situation there was no

20    time.

21         Q.   Well, you were telling, basically commanding someone

22    to open the door; correct?

23         A.   Yes, I was.

24         Q.   Okay.  And you did not know exactly what was going

25    on inside the apartment when you were making that command; is

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                          Page 47

```
 1   door.
 2           I just heard a struggle, and it wasn't immediately
 3   behind the door.  It sounded like it was in the apartment
 4   like someone was trying to get to the door.
 5       Q.   Right.  But when you kicked the door open, she was
 6   close to the door; correct?
 7       A.   That's correct.
 8       Q.   So that would have given you some information at
 9   least that she had moved closer to the door in between you
10   hearing the struggle and the time you kicked the door open?
11       A.   I don't know who was behind the door.
12           Logically speaking, after what I had just heard and
13   inside the apartment, logically, I cannot think of why the
14   person I thought might be in a mortal struggle or injured
15   inside of an apartment with unknown armed intruder who would
16   now be standing directly in front of the door.
17           When I made the decision to kick that door, I was
18   expecting an armed or violent encounter.  I positioned myself
19   in front of that door willing to be shot to save her.
20           I don't know who was standing behind that door.
21           I don't know if it was her or the suspect.
22       Q.   Okay --
23       A.   But immediately after kicking that door --
24           I'm sorry.
25       Q.   I'm sorry.  Go ahead.
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**

1            I cut you off.  I apologize.

2            MS. COOK:  Immediately after kicking that door --

3            THE WITNESS:  Immediately after kicking that door

4    there was -- there was no distance, there was no time.

5            My safety was a 100 percent threatened, you know.

6    Officer Smith's safety was in danger.  That and definitely,

7    you know, Ms. Jones, who I thought was -- was in danger.

8            So the second I kicked that door, there is now I'm

9    presented with an unknown person or a person standing in

10   front of this doorway which looks like a shooting stance to

11   me.  It's -- it's a threat that I had.  I had no idea who was

12   behind that door.

13           Logically speaking, I didn't have any idea that it

14   would be Ms. Jones after what I heard.

15   BY MR. GALIPO:

16       Q.   But you would agree if you saw a female unarmed at

17   the door, then based on your training it wouldn't be

18   appropriate to shoot her?

19       A.   So I'm really struggling with your question.

20           I'll tell you why.  Are you saying like if she had

21   opened the door, or we talking like I kicked the door open?

22       Q.   Either way.  Either way.  If you see a female there

23   and she's not armed, and not in a shooting stance, she just

24   happens to be there either because she was walking to open

25   the door for you or she making a mad dash for the door, or

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 51

```
 1        Q.   Okay.

 2             MS. COOK:  Mr. Galipo, would now be a good time to

 3   take a break?

 4             MR. GALIPO:  Yes.  This would be fine.

 5             Let's take a ten-minute break if that works for

 6   everybody.

 7             MS. COOK:  Thank you, sir.

 8             THE WITNESS:  Yes, sir.

 9             MR. GALIPO:  Okay.  Thank you.

10             (Recess taken.)

11   BY MR. GALIPO:

12        Q.   What part of the door or door frame did you kick?

13        A.   Just a little left of the door handle.

14             That's where I was aiming for.

15        Q.   And did you notice any part of the door or door

16   frame breaking when you made the kick?

17        A.   No.

18        Q.   Had you ever kicked-in a door before during or in

19   the line of duty?

20        A.   Yes.

21        Q.   On how many prior occasions?

22        A.   Twice that I can remember.

23        Q.   And how far do you think the door opened?

24        A.   It -- it opened just a -- just a fraction, just a

25   little bit.  That's hard to judge.  I don't know how to
```

 1    estimate a door opening, but I could tell you that it did not

 2    open all the way.  It didn't even open halfway.

 3            It opened maybe about a quarter of a way.

 4       Q.   And when you opened, partially opened, that's when

 5    you could see a person there?

 6       A.   That's correct.

 7       Q.   And could you see the person from head to toe?

 8       A.   No.

 9       Q.   And you're saying you could not see what the person

10    was wearing?

11       A.   No.

12       Q.   And you couldn't tell the race of the person?

13       A.   No.

14       Q.   And you're saying you couldn't tell if it was a

15    white male or not?

16       A.   No.

17       Q.   Is that correct?

18       A.   That's correct.

19       Q.   Okay.  I want to show you Exhibit 1.

20            We're going to try to screen-share, and I believe

21    this was taken from I think your body-worn camera.

22            Let me know if you could see it once we try to put

23    it on the screen.

24            (Exhibit 1 was marked for identification.)

25            MR. GALIPO:  I think Karen is trying to help us with

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                    Page 56

```
 1   this circumstance is because you never saw a gun?

 2      A.   I didn't see a gun.  That's correct.

 3      Q.   And I think if I understand your testimony

 4   correctly, you're saying you could not see the individual's

 5   hands?

 6      A.   No, not -- just forearms.  I didn't see hands.

 7      Q.   Are you trained as an officer to look at the -- look

 8   for the hands?

 9      A.   Yes.

10      Q.   Were you trying to look at the person's hands?

11      A.   There was no time to look at her hands.

12      Q.   So after you fired the shot and then went to your

13   position, what did you do next?

14      A.   Quickly -- so right after I fired my shot I moved

15   offline.  I heard the female say you shot me.  At that point

16   I made an assumption that that was probably the caller that

17   had just been shot.

18           I opened up the door to the apartment and stepped

19   in, and that's when I saw a black female sitting down on the

20   couch next to a black male.

21      Q.   Did you search her at any time?

22      A.   No.

23      Q.   Search the black male?

24      A.   No.

25      Q.   Did you apologize to her for shooting her?
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 57

```
1      A.   No.
2      Q.   Did you tell her I thought you had a gun or were
3   going to shot me?
4      A.   No.  I did make some statements when I walked in
5   there, and I would be happy to tell about it if you want to
6   know.
7      Q.   Sure.
8      A.   So after I walked in the apartment she was sitting
9   on the couch and said you shot me.  I said you called 911,
10  you reported there was a gun, there's a gun sitting right
11  here, and I asked if she was okay.
12     Q.   When you say there was a gun sitting right here,
13  what were you referring to?
14     A.   The gun inside the backpack that we located down in
15  the bush.
16     Q.   But I just want to be clear.
17          You did not shoot her, did you, because there was a
18  gun in the backpack?
19     A.   No.
20     Q.   Okay.  Any other conversation you remember with the
21  black female?
22     A.   Yeah.  After I asked if she was okay, I asked her to
23  come outside so we can get her medical attention, and then
24  she didn't come outside.  She just sat on the couch.
25     Q.   And then what happened?
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                           Page 63

```
 1   BY MR. GALIPO:
 2       Q.   Was there any debriefing about this incident within
 3   the department after it occurred?  What went well; what could
 4   have maybe gone differently?
 5       A.   I don't know.
 6       Q.   Were you a part of any debriefing?
 7       A.   No.
 8       Q.   So has your assignment stayed the same since this
 9   incident till now?
10       A.   Yes.  I'm still on patrol.
11       Q.   Have you had any contact with Ms. Jones or that
12   apartment complex since the incident?
13       A.   No.
14       Q.   Okay.
15            MR. GALIPO:  Why don't we take our last break for
16   five minutes and then I'm hoping we can wrap this up by 3:00.
17            MS. COOK:  Thank you.
18            THE WITNESS:  Yes, sir.
19            (Recess taken.)
20   BY MR. GALIPO:
21       Q.   Were you surprised that someone was right inside the
22   doorway when the door was kicked open?
23       A.   Yes.  That's pretty much -- yeah, that's a logical
24   thing.  I didn't -- I didn't expect anybody to be there.
25            The only logical -- what surprised me was I was
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                    Page 64

1   expecting an armed or violent encounter behind the door.

2           You know, after what I heard inside the apartment,

3   the struggle, I couldn't come up with a logical reason why

4   the caller would be behind the door.  What I had thought in

5   my mind was she was going to be in the apartment.

6           Her, injured, bleeding out or something, and why

7   would somebody be standing behind the door with all the

8   previous circumstances, and it was -- it was to set up a

9   position to harm me or -- or you call the police.  We're

10  knocking on the door.  Whoever is inside knows we're on the

11  other side of the door.  I told them that I'm going to --

12  we're breaching, we're going to kick this door down, we're

13  coming inside.

14          So that confrontation is going to have to happen.

15          You know, whoever is inside is going to have to deal

16  with us.  Logically, I had no idea why the caller would be

17  behind the door without, you know, saying something.

18          Hey, I'm right here, don't kick my door in, just a

19  second, you know.  Anything would have changed the, you know,

20  the tactic.  So that's -- that's fair to say that her being

21  directly behind the door was surprising.

22      Q.   So you're saying that you were expecting an armed

23  confrontation even before you kicked the door open?

24      A.   I was.  Or other type of violent encounter.

25      Q.   Even though you were aware that the gun was found in

```
 1    the backpack on the first floor?

 2        A.    Yep.

 3        Q.    Okay.  I think that's all the questions I have.

 4            MR. GALIPO:  Debra, do you have any questions for

 5    the officer today?

 6            MS. COOK:  I do.  I just have one.

 7                          EXAMINATION

 8    BY MS. COOK:

 9        Q.    So Mr. Galipo did a good job of unpacking what

10    happened that day, but what I would like you to do is just

11    kind of -- if you can articulate from beginning to end from

12    the moment that you got the call until you shot, each piece

13    of data that you were processing and the impact that it had

14    on your evaluation of the totality of the circumstances in

15    kind of like a realtime overview, please.

16            COURT REPORTER:  And do it slowly, please.

17            Thank you.

18            THE WITNESS:  Yes, ma'am.

19            Upon initial, you know, getting that dispatch call,

20    it came out as a high priority call; a subject with a gun;

21    female caller; white male suspect wearing a white T-shirt,

22    black pants with a black backpack armed with a handgun; had

23    walked into her apartment.

24            This -- this is significant to me because one,

25    we have an obvious male/female gender.  Males are typically
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    Page 66

 1   stronger than females.  So, you know, females are usually had

 2   a disadvantage.  The second thing that was going through my

 3   mind is that this person's unknown and he had just walked

 4   into her apartment.  And I have -- I have previous

 5   experiences when males have been inside female's apartments

 6   and the outcome was -- was not good.

 7           And I didn't want to be standing outside the door

 8   again if a female was murdered by -- by somebody, by an

 9   unknown male.  These are things I'm processing while I'm

10   driving to the call.  I also was notified that dispatch was

11   making call backs to her to get more information, clarifying

12   information, and I received no more information.

13           Once I arrived at the call I was hoping to get some

14   sort of other information because as from the time I get the

15   call to the time I'm arriving at the complex to the time I'm

16   walking up to the door and the time I get to the door, I mean

17   everything is -- everything is rapidly-evolving.  Everything

18   is constantly changing.  My plans are changing.

19           Am I going too fast, or are you okay?

20           MR. GALIPO:  You're doing good.

21           THE WITNESS:  Okay.  I just don't want to go too

22   fast for the reporter.

23           When I arrived at the apartment, I see Officer

24   Smith.  I know I have a backup officer there, and just like

25   hundreds of calls I've been on before, we have to go -- we

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                          Page 67

```
 1   have to go find out what's going on, make sure everybody's

 2   okay.  As we walk to the complex, we were -- we ran into two

 3   residents there.  We asked them, hey, where's Apartment 214

 4   just being unfamiliar with the complex.

 5            First person didn't give us really any information.

 6   As we continued walking in the direction of the apartment,

 7   that's when we found the backpack.  Officer Smith looked in

 8   the backpack, found a gun, and immediately what went through

 9   my mind there was, okay, did this person just kill her and

10   take off running and dump the gun?  Did he shoot her?  Is he

11   bleeding out?

12            I told Officer Smith, hey, grab that bag and let's

13   go make sure she's okay.  Officer Smith grabs the backpack.

14   I was standing in front of him.  As we're going up the

15   stairs, there is a another resident.  I told him, hey, come

16   out of the way.  I didn't know what was on the other side of

17   the door.  I didn't know what I was going to find.  I didn't

18   want any residents getting in the way of whatever was about

19   to happen.

20            Once I reached the top of the stairs, I looked to my

21   right, and down the hallway I saw apartment 214.  Being in

22   front I made my way down the hallway towards the door.  I did

23   it quietly all while trying to gather as much intel as I

24   could during that walk.  Do I hear anything, do I hear

25   screaming, do I hear yelling, do I hear talking, does it
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                      Page 68

1   sound normal like everything is fine.

2          I don't hear anything.  This was concerning to me

3   because I don't know if she was -- she was dead or injured in

4   there.  So I found my -- I went to my little position of

5   concealment.  I wouldn't call that cover at all.  It was

6   really thin walls.  Had I noticed that I had a light right

7   above me that was black-lighting me, and I was in a position

8   of disadvantage.  That apartment complex had a peep hole.

9          I know if you look out the peep hole, you're still

10  going to see me standing there.  After standing there I don't

11  hear anything, and that's when I knocked on the door.  I

12  announced that we were the police, took my step back into the

13  little alcove, waited a second, listened again, and at that

14  time that's when I heard noises in the apartment that sounded

15  like a struggle to me.

16         I -- I said to Mike we're going to have to boot this

17  door.  At that point even though we had found a backpack and

18  a gun, just because we found one gun doesn't mean there is

19  two or just because there is one suspect reported doesn't

20  mean there is two.

21         At that point I thought there is still a legitimate

22  threat inside of that apartment, and I believed that

23  Mr. Jones' life was in jeopardy.  Knocked again, don't hear

24  any -- still no response.  Nobody called out.  Nobody made

25  any type of -- and I didn't hear any screaming.  I didn't

1    hear any yelling.  I didn't hear anything like, hey, it's the

2    police, or come help me.  I didn't hear anything other than

3    the struggle.

4            As I wanted to go to boot the door, Officer Smith

5    said hold on, knock again, which okay, I agreed.  You know,

6    it can't hurt.  Let's knock again.  I used my flashlight and

7    banged on the door super loud, police, going to kick the door

8    in.  I have now knocked three times.

9            If the person on the other side of the door was a

10   threat, noticed I'm there, knows that one way I'm coming in

11   is through that door, I made the decision to put myself in

12   front of this door and kick it open, and the thing that's

13   going through my mind then was Officer Gregory [phonetic] who

14   was shot and killed through a door in 2018.

15           But I put myself in front of the door and kicked it

16   open.  The second I booted it I was met with two forearms

17   outstretched in front of me.  I believed I was going to be

18   shot.  My goal at that point was hopefully I take a round

19   somewhere where it's not going to be fatal and I could stay

20   and fight and get my round off first and get offline.

21           I did exactly that.  And at that point I heard the

22   female state that I shot her.

23           MS. COOK:  Thank you, Officer LaPoint.

24           I don't have any other questions.

25           Did you have any follow-up, Mr. Galipo?

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                      Page 72

```
 1                        CERTIFICATE

 2                            OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8         That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15         Further, that the foregoing is an accurate

16    transcription thereof.

17         I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  January 6, 2023.

23

24                          _____
                            Jinna Grace Kim, CSR No. 14151
25
```