# Exhibit "3"

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   DEZSANEE JONES,                        )
                                            )
 5              Plaintiff,                  )
                                            )
 6              vs.                         ) Case No.
                                            ) 5:22-CV-1764-SSS-SP
 7   CITY OF RIVERSIDE; TAYLOR LAPOINT;     )
     MIKE SMITH; and DOES 1-10,             )
 8   inclusive,                             )
                                            )
 9              Defendants.                 )
     _____)
10

11

12

13

14         REMOTE VIDEOCONFERENCE DEPOSITION OF

15                     MICHAEL SMITH

16                FRIDAY, JANUARY 6, 2023

17

18

19

20

21

22

23   Reported By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:   432537
```

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4    DEZSANEE JONES,                    )
                                         )
 5              Plaintiff,               )
                                         )
 6              vs.                      ) Case No.
                                         ) 5:22-CV-1764-SSS-SP
 7    CITY OF RIVERSIDE; TAYLOR LAPOINT; )
      MIKE SMITH; and DOES 1-10,         )
 8    inclusive,                         )
                                         )
 9              Defendants.              )
      _____)
10

11

12

13

14         The remote videoconference deposition of MICHAEL

15   SMITH, taken on behalf of the Plaintiff, beginning at 10:05

16   a.m., and ending at 11:47 a.m., on Friday, January 6, 2023,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:   DALE K. GALIPO, ESQ.
                BY:   HANG D. LE, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              Tel:  818-347-3333
                Fax:  818-347-4118
 7              E-mail:  dalekgalipo@yahoo.com
                E-mail:  hlee@galipolaw.com
 8

 9    For the Defendants:

10              OFFICE OF THE CITY ATTORNEY-CITY OF RIVERSIDE
                BY:   DEBRA K. COOK, ESQ.
11              3750 University Avenue, Suite 250
                Riverside, California 92501
12              Tel:  951-826-5567
                Fax:  951-826-5540
13              E-mail:

14
      Also Present:  Dezsanee Jones, Judith Gallardo, Avi Melec
15    Vargas, Giana Divernardo

16

17

18

19

20

21

22

23

24

25
```

1  about this incident?
2      Q.   No.  On other incidents, other locations.
3      A.   On other locations that happens on a regular basis,
4  yes.
5      Q.   In other words, sometimes you know the person, you
6  may be aware of their criminal history, for example, or prior
7  contact with law enforcement?
8      A.   Yes.  That's correct depending on where we're going
9  and if it's somewhere we've been to in the past, then
10 unfortunately, a lot of times there is visual calls that we
11 go to that you get familiar with the houses, who lives there,
12 and what the normal problems are at those houses, yes.
13     Q.   But in this case at least you did not have
14 information specifically on who the suspect was or whether he
15 had a criminal history; is that fair?
16     A.   In this incident, yeah.  I had no knowledge of who
17 our suspect was.
18     Q.   And then you said something about a backpack.
19          That came over the radio?
20     A.   Yes, it did.
21     Q.   All right.  Was there any other identifiers that you
22 had either of the male or the female in terms of -- I don't
23 know, age, height, weight, other clothing?
24     A.   From what I recall, they told us it was a white male
25 adult who was in the apartment wearing a white shirt and

```
 1   black pants.
 2        Q.   And do you recall generally where you responded
 3   from?
 4        A.   I was in the area of University and Iowa which was I
 5   would say less than two miles from where the call was.
 6        Q.   Do you have an approximation as to how long it took
 7   you to get to the location?
 8        A.   I would say it was approximately two minutes.
 9        Q.   Had you been to that particular location before?
10        A.   Prior to this call I had never been to that
11   apartment complex.
12        Q.   And where generally did you park your police unit?
13        A.   When we pulled in the apartment complex, there is
14   a -- I'll describe it because it's kind of a complex setup.
15             There is a car wash out front, so you have to drive
16   through the car wash.  Then you have to drive through the
17   gates of the apartment.  So we had to drive through the
18   gates.  Then when you're driving in on your left when you're
19   driving in is the leasing office and a set the garage doors
20   that have hallways going through the courtyard area of the
21   apartment complex.
22             So we parked along the garage doors of the apartment
23   complex to get access to one of the breeze ways.
24        Q.   Did you arrive at about the same time as your
25   partner officer?
```

1      A.   Office LaPoint pulled in just before I did to the
2   call.  So I pulled in and parked behind him.
3      Q.   Had you worked with Officer LaPoint before?
4      A.   Yes.
5      Q.   Do you have an estimate as to how long you had known
6   Officer LaPoint before the time of this incident in 2021?
7      A.   Since I graduated the academy we worked on and off
8   together on different shifts, and I would say for about a
9   year straight we were assigned to graveyard working the same
10  days and nights.
11     Q.   So you were familiar with Officer LaPoint; is that
12  fair?
13     A.   Yes, sir.
14     Q.   And after you got out of your police vehicles, was
15  there any discussion you had with Officer LaPoint about a
16  tactical plan?
17     A.   When we got out of the -- when we got out of our
18  cars, our main priority was to locate the apartment because
19  it was -- we didn't know where the apartment was located.
20          So our decision was to locate apartment that way we
21  can make sure that the female who had called us was safe.
22     Q.   And you had the apartment number; correct?
23     A.   Yes, sir.  214.
24     Q.   But because you were not there, you had not been
25  there before, you were not exactly sure where 214?

```
 1      A.   Yes, sir.
 2      Q.   That would be both yours and Officer LaPoint's?
 3      A.   Yes, sir.
 4      Q.   I understand obviously there was a concern for the
 5   safety of the female caller and finding the apartment.
 6           I guess what I'm wondering is, if there was any
 7   discussion between you and Officer LaPoint regarding, you
 8   know, contact-cover configuration, you know, who would knock
 9   on the door, who would give the commands, anything like
10   that?
11      A.   We never specifically spoke and said, hey, you'll be
12   contact, you'll be cover.  He had went upstairs to the door
13   first at which point he took a contact position, and then it
14   was my responsibility to take a cover position as we're
15   normally trained throughout field training in the academy
16   your rolls will continue to evolve depending on the
17   situation.
18      Q.   Okay.  And what did you understand the cover
19   position to be in this context?
20      A.   If you -- do you want to go back to the beginning of
21   the incident, or to the door --
22      Q.   No.  I'm trying to -- I'm trying to move forward to
23   the time where you located the Room 214, Apartment 214.
24           It appears that you at some point were able to
25   locate the apartment number?
```

```
 1      A.   Yes.  I thought it was a going to associated because
 2   it was -- it's not a normal thing to see anywhere just a
 3   backpack just laying on top of the bushes.
 4      Q.   And did you do anything with regards to the
 5   backpack?
 6      A.   Yes, I did.
 7      Q.   What did you do?
 8      A.   It was abandoned property.  There was nobody around
 9   it.  So I went over and grabbed the backpack, picked it up,
10   could feel the weight of it, felt like there was obviously an
11   object in there.  I opened the backpack and inside the
12   backpack I located a handgun inside of it, a revolver.
13      Q.   What color was that?
14      A.   At the time I located it it was inside a sock.
15           So I couldn't give you a specific color of it.
16      Q.   But you could tell by the feel of it the shape of
17   it, it appeared to be a revolver to you?
18      A.   Yes, sir.
19      Q.   And then what did you do after you noticed the
20   revolver?
21           Did you leave the backpack there?
22           What did you do?
23      A.   No.  At that point I recovered the backpack, make
24   sure it was secured.  I mean it would be terribly unsafe and
25   kind of silly for me to leave a backpack with a gun sitting
```

```
 1   behind unattended.
 2           So for our safety, the safety of the public in that
 3   apartment, we recovered the backpack, and then my mindset
 4   shifted to I have now located the gun, I've now located the
 5   backpack, that this caller could be seriously injured, that
 6   there could be now at this point our dispatchers had updated
 7   us to the point that they have tried to make calls back and
 8   they received no answer.
 9           So my mindset is this could we something that's
10   going bad.  Officer LaPoint says we need to go check on the
11   caller.  We have no other options.  So that's when we make
12   our way up to and locate Apartment 214.
13      Q.   Let me ask you this.
14           Was there any report over the police radio of shots
15   fired before you located Apartment 214?
16      A.   No.  There had not been any reports of that at that
17   time, no.
18      Q.   Did you hear any shots fired?
19      A.   No, I did not.
20      Q.   Did anyone tell you that there had been shots fired
21   before you got to Apartment 214?
22      A.   There was nobody we spoke to and nobody that we
23   asked prior to getting to the apartment if they heard shots
24   fired.  The only thing we asked two people we saw is if they
25   knew where the apartment was.
```

```
 1     Q.   Did you have any specific injury that -- sorry.
 2          Did you have any information that anyone had been
 3   injured?
 4     A.   At that point no because the 911 call to our
 5   dispatchers had been dropped.  So the information that was
 6   provided to us was what I had initially stated to you, that
 7   it was a white male adult unknown to the RP, who was armed
 8   with a black backpack and a handgun and then the call
 9   disconnected.  So that information was never relayed.
10          So there was a disconnect followed by call backs
11   that were not successful.  So the information not necessarily
12   was ever contacted or relayed, no.
13     Q.   Okay.  I'm assuming you did not up to that point
14   call for medical or paramedics because you didn't have any
15   information of a specific injury; would that be correct?
16     A.   At that point, no, we had not requested medical
17   attention.
18     Q.   Okay.  Obviously, if you would had specific
19   information that someone needed medical attention, then you
20   would have requested it?
21     A.   If somebody needed medical attention, that's going
22   to be our first priority getting them the help they need.
23     Q.   And so your understanding from the call was whoever
24   the female was, was calling from Apartment 214?
25     A.   Yes.  That was the information that we had, that the
```

1  something I'll come back to it.  So I think by the end we'll
2  cover everything, but I think it's better we did it that way
3  just so we can go chronological.
4      A.   Yes, sir.
5      Q.   So okay.  So now you're approaching Apartment 214.
6           When you listen to your body-worn camera recently,
7  I'm assuming it has audio on it, also --
8      A.   Yes, it does, sir.
9      Q.   Obviously, you would be able to hear whatever is
10 being said between you and Officer LaPoint?
11     A.   That's correct.
12     Q.   Did you hear any screaming coming from Apartment 214
13 when you were approaching it?
14     A.   When we were approaching I did to the hear any
15 screaming.
16     Q.   Did you hear any sounds of a struggle or a fight
17 when you were approaching 214?
18     A.   From my position where I was at Apartment 214 I
19 could hear what I would call shuffling inside of the
20 apartment which can vary as to what you constitute sounds of
21 a struggle versus what other people do.  So the best I can
22 describe it was there was shuffling inside the apartment.
23          So that was the noise that I heard inside the
24 apartment.
25     Q.   So shuffling like someone could be walking and

1  moving in the apartment?
2      A.   That's correct.  It gave me the -- from what I could
3  tell from the shuffling, it was something moving around
4  inside the apartment.  What it was, how it was being moved, I
5  couldn't give you an exact answer.
6      Q.   Did you communicate that at that time to Officer
7  LaPoint that you heard shuffling?
8      A.   Yes.  I told him I heard noise from inside the
9  apartment.
10     Q.   And you were referring to the shuffling?
11     A.   Yes, sir.
12     Q.   And then at some point did Officer LaPoint approach
13  the door?
14     A.   So when I got up to the stairs because I had to
15  gather the backpack, Officer LaPoint was already at the door
16  at that point.
17     Q.   Okay.  And where were you positioned when you saw
18  Officer LaPaoint at the door?
19     A.   Absolutely.  So I'll describe the hallway for you,
20  the approach to the apartment just to make sure that -- that
21  there is a better understanding of it.
22          Come up to the stairs; there is -- you turn to the
23  right, and it's a hallway that I would say is probably ten to
24  fifteen feet, maybe about four foot wide that leads straight
25  down to the apartment door which is 214 at the end of the

1  hallway.  Right above the door there is a light that is
2  shining down.  So when someone's standing in the doorway, you
3  can see who is standing there.  And then to the left there is
4  a little alcove that you can step off into that wouldn't be
5  standing in front of the door.  So when I get to the top of
6  the stairs, right at the end of that hallway there is a
7  90-degree corner that leads down to another walkway going
8  away.
9          So did I explain that good enough?
10    Q.   Yeah.  That's good.
11    A.   Okay.  Right at that 90 is where I took position
12  because Officer LaPoint was up in front of me at that little
13  cutout of the alcove.  So there was no way that we both could
14  have safely fit right in front of that -- right in front of
15  the door.  It would have put him in a bad spot and me in a
16  bad spot.
17          So I took a position of concealment because it
18  wasn't hard cover behind that 90-degree corner.  So that way
19  I had a visual of the door, and then Officer LaPoint had room
20  to the step off to the side of the door after knocking on the
21  door.
22    Q.   Thank you for that.
23          COURT REPORTER:  I want to ask you to slow down
24  because you're talking really fast.
25          THE WITNESS:  Okay.  Sorry.

1    Q.   And could you see Officer LaPoint?

2    A.   Yes.

3    Q.   And where was Officer LaPoint when you first saw him

4    in relation to the door?

5    A.   Standing just to the left of the door in that little

6    alcove to the left, a little cutout that leads down to more

7    apartments.

8    Q.   And your body-worn camera would have already been

9    on?

10   A.   I turned it on at that point when we got up to the

11   top of the stairs.

12   Q.   And what, if anything did, you hear Officer LaPoint

13   say when he was in front of the door and you were in your

14   position of partial concealment?

15   A.   So at this point we had a little bit more of a -- we

16   spoke to each other a little more at this point.  He told me

17   initially that we were going to have to get into the

18   apartment and breach the door.  He knocked.  He gave some

19   announcements at the door that the police were there to which

20   we received no verbal response.  We received nothing from

21   inside the apartment.

22        So now we're not getting a response in there either.

23   He looks back at me again, tells me that we're going to have

24   to boot the door.  Between that one is when I heard the

25   shuffling.  So there was a first knock.  I hear the shuffling

```
 1   noise inside the apartment.  He then tells me we're going
 2   have to boot the door.  I said, you know, I said take a quick
 3   a second, knock again, you know, announcing, and again
 4   announces that there is -- that the police are there.
 5          He -- again, we get no verbal response from anybody
 6   inside the apartment.  We then make a -- he then tells me
 7   again.  So I'm like, you know, knock again, make another set
 8   of announcements that the police are at your door and that
 9   we're going to have to kick the door in because at this point
10   my mindset is this person could be injured to the point they
11   can't respond.  You know, and the last think I want to do is
12   stand at somebody's door while they succumb to a fatal
13   injury.
14          So we had a responsibility to get in there and help
15   this caller if she's been injured.  So for the life-saving
16   purposes and potential life-saving purposes of her, I told
17   him to give that last set of announcement saying if you
18   don't, you know, we're going to have to breach the door.
19          And he gave that last set of announcements.  We once
20   again got no response from inside the apartment.  He then
21   breaches the door.
22       Q.  Thank you.  I don't know if you were going slower or
23   not, but we got through it.
24       A.  I hope so.
25           THE WITNESS:  Was that better for you, ma'am?
```

1      COURT REPORTER: A little better.

2      THE WITNESS: Good.

3  BY MR. GALIPO:

4     Q.  All right. So you mentioned that you didn't hear

5  any verbal response from inside the apartment; is that

6  correct?

7     A.  Correct.

8     Q.  So you didn't hear anyone saying anything; is that

9  true?

10    A.  No. The only things that I heard inside the

11  apartment when we were there was that shuffling noise.

12    Q.  And I think you indicated earlier that part of the

13  call referenced a black backpack and a gun?

14    A.  That's correct, sir.

15    Q.  And you found that on the first floor outside of the

16  apartment?

17    A.  Yes, sir. It was outside on the laying on the

18  bushes.

19    Q.  So did you even know whether or not the suspect was

20  still in the apartment or had fled and dropped the

21  backpack?

22    A.  At that point we had no knowledge of where the

23  suspect could be located or if they're in the apartment or if

24  they had fled the location. We had zero knowledge of our

25  suspect at that point.

```
 1     Q.   I'm just wondering what part of Officer LaPoint's
 2   body could you not see at the time of the shot.
 3     A.   I would say majority of it.  All I could really see
 4   was his -- what would have been like the back left of his
 5   body when he was kicking the door.
 6     Q.   And then how much time passed approximately from the
 7   time you heard the shot to the time you were aware that it
 8   was Officer LaPoint who had shot?
 9     A.   I would say less than ten seconds.
10     Q.   And then how much time passed before you approached
11   the open doorway?
12     A.   I would say that was less than a minute.
13     Q.   So now I'm talking about the time frame in between
14   the shot and you approaching the opened doorway.
15          Do you have that time frame in mind?
16     A.   I would say less than a minute, yes.
17     Q.   During that time frame, whatever it was, did you say
18   anything to Officer LaPoint?
19     A.   Before I went into the apartment?
20     Q.   Correct.  So in between the shot and you going into
21   the apartment.
22     A.   So yes.  I spoke -- the only -- so I'll clarify just
23   real quick because like I said, I always want to make sure
24   you have the entirety of the story.  I don't want you to
25   think I'm leaving anything out, God forbid; right?
```

1    So as soon as I heard the shot, I advised our
2    dispatchers that we had shots fired, and I asked them to
3    start medical aid.  At that point is after that is when I
4    then had contact with Officer LaPoint, and I asked Officer
5    LaPoint because he could be injured from a variety of
6    different things.  He could have gotten injured kicking the
7    door.  I asked him if he was okay to make sure he had no
8    physical injuries at that point in time that needed to be
9    tended to immediately because I knew there was another
10   officer that had already gone into the apartment to contact
11   who was inside the apartment.
12       Q.   What did Officer LaPoint say to you when you asked
13   him if he was okay?
14       A.   The exact words, no.  I remember him telling me he
15   was not physically injured, and that he had fired his
16   weapon.
17       Q.   Okay.  Do you recall saying anything else to Officer
18   LaPoint before you entered the apartment?
19       A.   I could -- so at that point I could tell Officer
20   LaPoint was emotional as anybody would be that's been
21   involved in a situation like this; right?  So I knew at that
22   point I still had this backpack sitting there that I brought
23   upstairs.  It had a gun in it.  I can't leave that backpack
24   unattended just like in the bushes.  We have a gun.  We can't
25   leave it unattended.

```
 1                      CERTIFICATE

 2                          OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8         That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15         Further, that the foregoing is an accurate

16   transcription thereof.

17         I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  January 6, 2023.

23

24         _____
            Jinna Grace Kim, CSR No. 14151
25
```