**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiff
DEZSANEE JONES

# UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

DEZSANEE JONES,

        Plaintiff,

   vs.

CITY OF RIVERSIDE; TAYLOR
LAPOINT; MIKE SMITH; and DOES
3-10, inclusive,

Defendants.

Case No. 5:22-cv-01764-SSS-SP

*Honorable Sunshine S. Sykes*
*Hon. Mag. Judge Sheri Pym*

**PLAINTIFF'S STATEMENT OF
GENUINE DISPUTES OF
MATERIAL FACTS AND
ADDITIONAL UNDISPUTED
MATERIAL FACTS**

[Filed concurrently with Plaintiff's
Memorandum in Opposition; Plaintiff's
Objections; Attorney Declaration and
exhibits thereto]

1         Pursuant to Local Rule 56-2 and the Court's December 1, 2022 Civil Standing

2    Order, Plaintiff respectfully submits this Statement of Genuine Disputes of Material

3    Facts and Additional Undisputed Material Facts in support of her Opposition to

4    Defendants' Rule 56 Motion for Partial Summary Judgment.

5

6    DATED:  December 23, 2023          LAW OFFICES OF DALE K. GALIPO

7

8

9

10                  By_____*/s/ Hang D. Le*_____

11                      Dale K. Galipo
                        Hang D. Le
12                      Attorneys for Plaintiff DEZSANEE JONES

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 1. Plaintiff Dezsanee Jones ("Plaintiff") called 911 twice on September 20, 2021 with the first 911 call at approximately 2:17 p.m. on September 20, 2021 ("First 911 Call").<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Dezsanee Jones December 1, 2023 Deposition ("Plaintiff Depo.")* at pg:ln 10:18- 22 attached to the *Declaration of Debra K. Cook ("Cook Decl.")* ¶1;<br>• **EXH. 4**, *Plaintiff's Responses to City's Request for Admissions, Set One ("RFA1")* No. 1 at pg:ln 3:5-8 attached to *Cook Decl.* ¶4.<br>• **EXH 5,** *Plaintiff's Responses to City's Interrogatories Set 1 ("ROGS1")* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **Undisputed.** |
| 2. Plaintiff was at her residence located at 807 Blaine Street., Apt. 214, Riverside when she made the First 911 Call.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff Depo.* at pg:ln 10:18-22, 43:15-19 attached to the *Cook Decl.* ¶1;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 3.  In the First 911 Call she told the 911 operator ("Operator") that there was "a boy in here with a gun in my house." <br><br> **EVIDENCE**: <br> • **EXH 1,** *Plaintiff's Depo* at pg:ln 11:1-4 attached to *Cook Decl.* ¶1; <br> • **EXH. 4**, *RFA1* No. 2 at pg:ln 3:9- 13 attached to Cook Decl. ¶4; <br> • **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5; <br> • **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **<u>Undisputed.</u>** |
| 4.     In the First 911 Call, in response to Plaintiff's report that there was "a boy in here with a gun in my house," the Operator asked Plaintiff "do you know this individual." <br><br> **EVIDENCE**: <br> • **EXH 1,** *Plaintiff's Depo* at pg:ln 11:5-8 attached to *Cook Decl.* ¶1; <br> • **EXH. 4**, *RFA1* No. 3 at pg:ln 3:14- 18 attached to Cook Decl. ¶4; <br> • **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **<u>Undisputed.</u>** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 5.     In the First 911 Call, in response to the Operator's question asking Plaintiff if she knew the individual, Plaintiff said "no."<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 11:9-11, 12:7-9 44:3-8 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 4 at pg:ln 3:19-23 attached to Cook Decl. ¶4;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6. | **Undisputed.** |
| 6.     Plaintiff lied when she told the Operator that she did not know the individual with a gun in her house.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 44:3-8 attached to *Cook Decl.* ¶1.<br>• **EXH. 4**, *RFA1* No. 22 at pg:ln 7:23-27 attached to Cook Decl. ¶4; | **Undisputed.** |
| 7.     The boy in her house with a gun was Plaintiff's boyfriend, Resan Bingham.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 21:13-25 attached to *Cook Decl.* ¶1. | **Undisputed**. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 8.      The Operator asked Plaintiff for "a description of him [Resan Bingham], White, black, Hispanic, Asian?"<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 11:14-24 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 6 at pg:ln 4:4- 11 attached to Cook Decl. ¶4;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6. | **Undisputed.** |
| 9.      Plaintiff replied, "Uh, black. White shirt, black pants. Black socks, black shoes."<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 11:14-24 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 6 at pg:ln 4:4- 11 attached to Cook Decl. ¶4;<br>• **EXH 5**, *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6. | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 10.      The Operator followed up with the clarification question, "You said white male?"  **EVIDENCE**: <ul><li>**EXH 1,** *Plaintiff's Depo* at pg:ln 11:25-12:6; 54:2-18 attached to *Cook Decl.* ¶1;</li><li>**EXH. 4**, *RFA1* No. 6 at pg:ln 4:4- 11 attached to Cook Decl. ¶4;</li><li>**EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6.</li></ul> | **<u>Undisputed</u>.** |
| 11.      Plaintiff clarified, "White."  **EVIDENCE**: <ul><li>**EXH 1,** *Plaintiff's Depo* at pg:ln 11:25-12:6; 54:2-18 attached to *Cook Decl.* ¶1;</li><li>**EXH. 4**, *RFA1* No. 6 at pg:ln 4:4- 11 attached to Cook Decl. ¶4;</li><li>**EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6.</li></ul> | **<u>Disputed</u>** that Ms. Jones clarified the suspect's race as white.  Ms. Jones misunderstood what the 9-1-1 operator was saying when she answered back, "White." Ms. Jones believed the 9-1-1 operator was asking her to confirm the color of the suspect's shirt.  Ex. 1 to Cook Decl., Jones Dep. 54:2-55:7; Ex. 4 to Cook Decl., Plaintiff's Response to Request for Admission No. 6. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 12.    Plaintiff lied when she told the Operator that the individual [Resan Bingham] was a white male.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 54:2-25 attached to *Cook Decl.* ¶1; | **<u>Disputed</u>**.<br><br>Ms. Jones misunderstood what the 9-1-1 operator was saying when she answered back, "White." Ms. Jones believed the 9-1-1 operator was asking her to confirm the color of the suspect's shirt.<br><br>Ex. 1 to Cook Decl., Jones Dep. 54:2-55:7; Ex. 4 to Cook Decl., Plaintiff's Response to Request for Admission No. 6. |
| 13.    The Operator asked Plaintiff "How old does he [Resan Bingham] look?"<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 55:10-21 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 7 at pg:ln 4:12-16 attached to Cook Decl. ¶4;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **<u>Undisputed.</u>** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 14.     Plaintiff replied that he [Resan Bingham] looked "about 29."<br><br>**EVIDENCE**:<br>  • **EXH 1,** *Plaintiff's Depo* at pg:ln 55:10-21 attached to *Cook Decl.* ¶1;<br>  • **EXH. 4**, *RFA1* No. 7 at pg:ln 4:12-16 attached to Cook Decl. ¶4;<br>  • **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>  • **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **Undisputed.** |
| 15.     Plaintiff further described the man in her house [Resan Bingham] as wearing a white shirt and black shorts.<br><br>**EVIDENCE**:<br>  • **EXH 1,** *Plaintiff's Depo* at pg:ln 56:21-58:19 attached to *Cook Decl.* ¶1;<br>  • **EXH. 4**, *RFA1* No. 8 and 9 at pg:ln 4:17-26 attached to Cook Decl. ¶4<br>  • **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>  • **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 16.    The Operator asked Plaintiff "What kind of gun was it?"<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 59:4-11 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 10 at pg:ln 5:1-7 attached to Cook Decl. ¶4;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6. | **Undisputed.** |
| 17.    Plaintiff responded "I'm not sure. I think it was like a handgun."<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 59:4-11 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 10 at pg:ln 5:1-7 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl*. ¶6. | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 18.    Plaintiff then told the Operator "I know he [Resan Bingham] has a black backpack."<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 12:25-13:3; 62:6-11 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 11 at pg:ln 5:8-12 attached to Cook Decl. ¶4;<br>• **EXH 5**, *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **<u>Undisputed</u>.** |
| 19.    Plaintiff intentionally disconnected the call at the demand of Resan Bingham.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 13:9-17 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 15 and 16 at pg:ln 6:1-9 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **<u>Undisputed</u>.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 20.     Shortly after Plaintiff disconnected the call, the Operator attempted to call Plaintiff back, but Plaintiff did  not pick up under threat by Resan Bingham.<br><br>**EVIDENCE**:<br> • **EXH 1,** *Plaintiff's Depo* at pg:ln 13:8-14:1 attached to *Cook Decl.* ¶1. | **Undisputed**. |
| 21.     RPD dispatched the call and marked it a high priority call.<br><br>**EVIDENCE**:<br> • **EXH 2,** January 6, 2023 *Deposition of Taylor Lapoint ("Lapoint Depo.")* at pg:ln 65:9- 66:6 attached to *Cook Decl.* ¶2; | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 22.    Defendant Taylor Lapoint ("Officer Lapoint") and Mike Smith ("Officer Smith") responded to the dispatch and arrived at Plaintiff's apartment complex within three minutes.<br><br>**EVIDENCE**:<br><ul><li>**EXH 1,** *Plaintiff's Depo* at pg:ln 88:25-89:19 attached to *Cook Decl.* ¶1.</li><li>**EXH 2,** *Lapoint Depo.* at pg:ln 65:9-66:6 attached to *Cook Decl.* ¶2.</li><li>**EXH 3,** January 6, 2023 *Deposition of Mike Smith ("Smith Depo.")* at pg:ln 20:6-21:2 attached to *Cook Decl.* ¶3;</li><li>**EXH 7,** Officer Lapoint's body worn camera video footage attached to *Declaration of Taylor Lapoint ("Lapoint Decl.")* ¶4;</li><li>**EXH. 8,** Officer Smith's body worn camera video footage attached to *Declaration of Mike Smith ("Smith Decl.")* ¶4;</li></ul> | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 23.    The dispatch conveyed to the officers the following: "a subject with a gun, female caller, white male suspect wearing a white t- shirt, black pants, with a black backpack armed with a handgun had walked into her apartment." <br><br> **EVIDENCE**: <br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 88:25-89:19 attached to *Cook Decl.* ¶1; <br>• **EXH 2,** *Lapoint Depo.* at pg:ln 65:9-66:6 attached to *Cook Decl.* ¶2; <br>• **EXH 3,** *Smith Depo.* at pg:ln 19:13-20:1 attached to *Cook Decl.* ¶3. <br>• **EXH. 6,** First 911 call audio attached to *Cook Decl.* ¶6. | **Undisputed.** |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 24.     When Officer Lapoint received the dispatch, he assessed the risk level as very high because his previous experiences when males have been inside female's apartments, the outcome could be dire.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 65:9-66:6 attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>If Officer Lapoint reasonably believed that when he kicked/breached the front door, he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources.<br><br>DeFoe Decl. ¶ 9.<br><br>The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence.<br><br>DeFoe Decl. ¶ 10.<br><br>If Officer Lapoint reasonably believed Ms. Jones was in immediate peril, he should have immediately requested a bullhorn, a ballistic shield and breaching tools to include a "ram."<br><br>DeFoe Decl. ¶ 11. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 25.      Officer Lapoint previously encountered a female murdered by a male intruder and wanted to make sure Plaintiff was safe. Officer Lapoint assessed this fact as an elevated risk factor for danger.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 66:7-12 attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>If Officer Lapoint reasonably believed that he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources.<br><br>DeFoe Decl. ¶ 9.<br><br>The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence.<br><br>DeFoe Decl. ¶ 10.<br><br>If Officer Lapoint reasonably believed Ms. Jones was in immediate peril, he should have immediately requested a bullhorn, a ballistic shield and breaching tools to include a "ram."<br><br>DeFoe Decl. ¶ 11. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 26.      Officers Lapoint and Smith received an update that Plaintiff's call disconnected and RPD Dispatch was attempting to call back. Officer Lapoint also assessed this fact as an elevated risk factor for danger.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Lapoint Depo.* at pg:ln 66:7-12 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 27:1- 12 attached to *Cook Decl.* ¶3. | **Disputed**.<br><br>If Officer Lapoint reasonably believed that he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources.<br><br>DeFoe Decl. ¶ 9.<br><br>The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence.<br><br>DeFoe Decl. ¶ 10.<br><br>If Officer Lapoint reasonably believed Ms. Jones was in immediate peril, he should have immediately requested a bullhorn, a ballistic shield and breaching tools to include a "ram."<br><br>DeFoe Decl. ¶ 11. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
| --- | --- |
| 27.     Officers Lapoint and Smith began their investigation to locate Plaintiff and her apartment residence.<br><br>**EVIDENCE**:<br>&bull; **EXH 2,** *Lapoint Depo.* at pg:ln 66:23-67:11 attached to *Cook Decl.* ¶2;<br>&bull; **EXH 3,** *Smith Depo.* at pg:ln 27:1- 12 attached to *Cook Decl.* ¶3;<br>&bull; **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>&bull; **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4. | **<u>Undisputed</u>.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 28.　　As Officers Lapoint and Smith swiftly made their way toward Plaintiff's apartment, they found a black backpack inside of a bush on the first floor outside Plaintiff's second floor apartment.<br><br>**EVIDENCE**:<br><ul><li>**EXH 1,** *Plaintiff's Depo* at pg:ln 92:9-13 attached to *Cook Decl.* ¶1;</li><li>**EXH 2,** *Officer LaPoint's Depo* at pg:ln 15:19-16:19 attached to *Cook Decl.* ¶2;</li><li>**EXH 3,** *Smith Depo.* at pg:ln 35:12-18 attached to *Cook Decl.* ¶3;</li><li>**EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;</li><li>**EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;</li><li>**EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;</li></ul> | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 29.    Inside the black backpack was a gun. Officer Lapoint also assessed this fact as an elevated risk factor for danger.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 15:19-16:19 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 25:4- 26:12 attached to *Cook Decl.* ¶3;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4; | <u>**Disputed**</u>.<br><br>The discovery of the black backpack and firearm relating to the call would have informed a reasonable officer acting consistent with standard police officer training and practices that the threat of harm to the Reporting Party had somewhat lessened as the weapon involved in the call was now contained.<br><br>DeFoe Decl. ¶ 5. |

| | |
|---|---|
| 30.      After discovering the gun, Officer Lapoint assessed the risk level as further elevated because Plaintiff could have been already shot, potentially bleeding out, and the suspect ran off and dumped the gun.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:5-11 attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>The discovery of the black backpack and firearm relating to the call would have informed a reasonable officer acting consistent with standard police officer training and practices that the threat of harm to the Reporting Party had somewhat lessened as the weapon involved in the call was now contained.<br><br>DeFoe Decl. ¶ 5.<br><br>If Officer Lapoint reasonably believed that he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources.<br><br>DeFoe Decl. ¶ 9.<br><br>The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence.<br><br>DeFoe Decl. ¶ 10.<br><br>If Officer Lapoint reasonably believed Ms. Jones was in immediate peril, he should have immediately requested a |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | bullhorn, a ballistic shield and breaching tools to include a "ram." <br><br> DeFoe Decl. ¶ 11. |
| 31.    Officer Lapoint told Officer Smith to grab the backpack and urgently find Plaintiff to assure she was safe. <br><br> **EVIDENCE**: <br> • **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:12-13 attached to *Cook Decl. ¶2;* <br> • **EXH 3,** *Smith Depo.* at pg:ln 25:4- 26:12 attached to *Cook Decl. ¶3;* <br> • **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl. ¶4;* <br> • **EXH. 8** Officer Smith's body worn camera video footage attached to *Smith Decl. ¶4;* | <u>**Disputed**</u> that Officer Lapoint told Officer Smith to urgently find Ms. Jones. <br><br> Neither the officers' deposition testimonies nor the videos from the officer body worn camera reflects any sense of urgency on Officer Lapoint's part. <br><br> *See* Ex. 2 to Cook Decl., Lapoint Dep. 67:12–13; Ex. 3 to Cook Decl., Smith Dep. 25:4–26:12; Ex. 7 to Lapoint Decl., Lapoint Body Worn Camera ("BWC") Video; Ex. 8 to Smith Decl., Smith BWC Video. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 32.    As Officers Lapoint and Smith were urgently looking for Plaintiff's apartment, Officer Lapoint cleared the way from bystanders as he approached the unit.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:12-19 attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4. | **<u>Disputed</u>** that the officers were "urgently" looking for Ms. Jones's apartment.<br><br>Neither Officer Lapoint's deposition testimony nor the videos from the officer body worn camera reflects any sense of urgency on the officers' part.<br><br>See Ex. 2 to Cook Decl., Lapoint Dep. 67:12–19; Ex. 7 to Lapoint Decl., Lapoint BWC Video; Ex. 8 to Smith Decl., Smith BWC Video. |
| 33.    Plaintiff's apartment [214] residence is on the second floor of her building and at the end of a hallway.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:20-22 attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4; | **<u>Undisputed</u>**. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 34.     Officer Lapoint was in front of Officer Smith and made his way to Plaintiff's apartment quietly.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:20-24 attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4; | **Undisputed.** |
| 35.     Attempting to gather as much intelligence as possible, Officer Lapoint could not hear any screaming, yelling, or talking.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:21-68:4 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 29:12-30:11 attached to *Cook Decl.* ¶3;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4; | **Undisputed.** |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 36.   This fact raised concerns for Officer Lapoint because he did not know if the caller was dead or injured inside the apartment. Officer Lapoint assessed this fact as an elevated risk factor for danger.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 67:21-68:4 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 33:8- 34:21 attached to *Cook Decl.* ¶3. | **Disputed**.<br><br>The absence of screaming, yelling, or talking would not have led a reasonable Police Officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk.<br><br>DeFoe Decl. ¶ 8. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 37. After not hearing anything, Officer Lapoint knocked on Plaintiff's apartment door, and announced his presence as the police for the first time commanded that the door be opened.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 21:9-18 attached to *Cook Decl.* ¶1;<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-21; 45:21-23; 68:11-15 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 33:8-34:21 attached to *Cook Decl.* ¶3.<br>• **EXH. 4**, *RFA1* No. 23 and 24 at pg:ln 8:1-12 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6-5:16 attached to *Cook Decl.* ¶5;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Declaration of Ryan Railsback ("Railsback Decl.")* ¶3. | **Disputed** to the extent that when Officer Lapoint knocked for the first time, he gave any commands for the door to be opened.<br><br>When Officer Lapoint arrived at the apartment door, he initially knocked and announced, "Police Department." He then made a second announcement of, "Police Department, come to the door." He then knocked a second time. He then announced, "Ma'am, police, come to the door. I'm gonna kick it down." A few seconds later, Officer Lapoint kicked down the door and intentionally shot Ms. Jones.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:38–14:23:38. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 38.     Officer Smith stood approximately four (4) to five (5) feet behind Officer Lapoint as backup and cover.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 28:21-29:9 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 23:6- 17; 30:17-31:8 attached to *Cook Decl.* ¶3.<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Disputed** as to the distance between Officer Smith and Officer Lapoint. Officer Smith's position was greater than four to five feet away from Officer Lapoint.<br><br>Officer Smith testified that the hallway from the stairs to apartment 214 was approximately ten (10) to fifteen (15) feet long and that Officer Lapoint was near the front door of apartment 214 while Officer Smith was positioned at the top of the stairs.<br><br>Ex. 3 to Cook Decl., Smith Dep. 30:17–31:8. *See* Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:40–47, 14:23:13–21, 14:23:32–34; Ex. 8 to Smith Decl., Smith BWC Video at 14:23:41–14:24:14.<br><br>Further **disputed** that the officers ever discussed any tactical plan or contact-cover configuration and designated Officer Smith as cover.<br><br>The officers never discussed a tactical plan or contact-cover configuration.<br><br>Ex. B to Le Decl., Smith Dep. 21:14–21; 23:6–12; *see* DeFoe Decl. ¶ 7. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 39.    Officer Lapoint placed himself in a point of concealment to the left of Plaintiff's apartment keeping the doorway clear.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-28:4; 68:11-15 attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Undisputed.** |

| 40.    From the point of concealment, Officer Lapoint heard what he believed to be a struggle coming from inside the apartment.<br><br>**EVIDENCE**:<br>  • **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-28:4; 68:11-15 attached to *Cook Decl.* ¶2.<br>  • **EXH 3,** *Smith Depo.* at pg:ln 29:12-30:11 attached to *Cook Decl.* ¶3. | **Disputed**.<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down. No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
|  | Ex. A to Le Decl., Lapoint Dep. 28:10–17. |

| 41.     From Officer Lapoint's perspective, the struggle sounded violent like someone was being held against their will, potentially making a last dash to the door and rolling around on the ground. Officer Lapoint assessed this fact as an elevated risk factor for danger.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-28:4; 68:11-15 attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down.  No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 28:10–17.<br><br>The absence of screaming, yelling, or talking would not have led a reasonable Police Officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk.<br><br>DeFoe Decl. ¶ 8. |
| 42.    Plaintiff did not answer the door in response to Officer Lapoint's commands because she was being restricted and held down by Resan Bingham's bodyweight.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 23:23-24:11 attached to *Cook Decl.* ¶1.<br>• **EXH. 4**, *RFA1* No. 28 at pg:ln 9:22-26 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5; | <u>**Disputed**</u> to the extent that this suggests Plaintiff never tried to answer the door in response to Officer Lapoint's commands.<br><br>At some point prior to Officer Lapoint kicking the apartment door in, Mr. Bingham let go of Ms. Jones and Ms. Jones made her way to the front door and was in the early process of opening the door when the door was kicked in and she was shot.<br><br>Jones Decl. ¶¶ 6-8. |

| | |
|---|---|
| 43.     Hearing what he thought was a violent struggle, Officer Lapoint believed there was still a legitimate threat inside the apartment and that the life of the female caller inside the apartment was in jeopardy.<br><br>**EVIDENCE**:<br>   • **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-28:4; 68:21-23 attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down.  No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 28:10–17.<br><br>The absence of screaming, yelling, or talking would not have led a reasonable Police Officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk.<br><br>DeFoe Decl. ¶ 8. |
| 44.    Instead of responding to Officer Lapoint's commands, Plaintiff made a second 9-1-1 call (Second 911 Call) to cancel the emergency police response.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 109:5-110:8 attached to *Cook Decl.* ¶1;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | <u>**Disputed**</u> to the extent that this suggests Ms. Jones never responded to Officer Lapoint's commands.<br><br>At some point prior to Officer Lapoint kicking the apartment door in, Mr. Bingham let go of Ms. Jones and Ms. Jones made her way to the front door and was in the early process of opening the door when the door was kicked in and she was shot.<br><br>Jones Decl. ¶¶ 6-8. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 45.　In the Second 911 Call, Plaintiff told the Operator "I made a report, and the person [Resan Bingham] isn't here anymore."<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1;<br>• **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | **Undisputed.** |
| 46.　Plaintiff lied to the Operator when she told her that Resan Bingham was no longer in her home.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1;<br>• **EXH. 4**, *RFA1* No. 12 at pg:ln 5:13-17 attached to Cook Decl. ¶4. | **Undisputed.** |
| 47.　Even though Plaintiff told the Operator that Resan Bingham was no longer in her home, Plaintiff still wanted the Police to arrive and help her.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1. | **Undisputed.** |

| | |
|---|---|
| 48.    The Second 911 Call audio depicts both Plaintiff and Resan Bingham scuffling.<br><br>**EVIDENCE**:<br>  • **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1;<br>  • **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | **<u>Disputed</u>** to the extent that the sounds of "scuffling" equate to a "violent struggle."<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down. No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 28:10–17. |

| | |
|---|---|
| 49.    Plaintiff admitted that the scuffle depicted in the Second 911 Call audio was Resan Bingham threatening Plaintiff.<br><br>**EVIDENCE**:<br>  • **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1;<br>  • **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | **<u>Disputed</u>** to the extent that the sounds of "scuffling" equate to a "violent struggle."<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down. No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 28:10–17. |

| | |
|---|---|
| 50.      Based on the totality of the circumstances and increasing levels of risk for danger, Officer Lapoint announced he wanted to kick in the door.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-27:13 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 33:8- 34:21 attached to *Cook Decl.* ¶3;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Disputed** as to the contention that the totality of the circumstances supports Officer Lapoint's decision to kick the door in at the time that he did.<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down.  No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the |

same sounds captured on his body-worn camera audio.

Ex. A to Le Decl., Lapoint Dep. 28:10–17.

A reasonable officer acting consistent with standard police practices and training, confronted with the facts of this incident, would not have made the decision to breach the door at the time Police Officer Taylor Lapoint breached the apartment door. It was not necessary for Police Officer Taylor Lapoint to breach the apartment door at the time that he did. There had not been a report of shot(s) fired at the location at the time of this incident and there were no screams emanating from inside the apartment. The absence of screaming, yelling, or talking would not have led a reasonable Police Officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk. In my opinion, Police Officer Taylor Lapoint had time to formulate a tactical plan with the other officers and to request additional resources, including Riverside Police Department Supervisor, additional Riverside Police Department Police Officers, Air Support, K9 and Riverside Police Department Special Weapons and Tactics, (SWAT), to include the Hostage Negotiations Team, (HNT).

DeFoe Decl. ¶ 8.

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Further **disputed** to the extent that Officer Lapoint announced to the occupants of the apartment that he was going to kick down the door at this time.<br><br>After Officer Lapoint's first knock on the apartment door, he said to Officer Smith *sotto voce*, "We're to boot this door." After Officer Lapoint's second "Police Department" announcement, he again said *sotto voce* to Officer Smith, "I say we fucking boot it, dude." Officer Lapoint then knocked the door for a second and third time, before announcing in a loud volume, "Ma'am, police. Come to the door. I'm going to kick it down." A few seconds later, Officer Lapoint kicked in the door and shot Ms. Jones.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:37–14:23:38[1]. |

---

[1] Because different media players may have different methods of calculating time for the video progress bar, Plaintiff refers to the "Motorola Solutions" timestamp in the upper righthand corner of the video for consistency among all media players.

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 51.      Officer Lapoint gave a second verbal warning that he was going to kick down the door.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 63:21-64:13 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 33:8- 34:21 attached to *Cook Decl.* ¶3;<br>• **EXH. 4,** *RFA1* No. 25 at pg:ln 8:13-23 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6-5:16 attached to *Cook Decl.* ¶5;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Disputed**. Officer Lapoint only ever gave one verbal warning to the occupants of the apartment that he was going to kick down the door.<br><br>After Officer Lapoint's first knock on the apartment door, he said to Officer Smith *sotto voce*, "We're to boot this door." After Officer Lapoint's second "Police Department" announcement, he again said *sotto voce* to Officer Smith, "I say we fucking boot it, dude." Officer Lapoint then knocked the door for a second and third time, before announcing in a loud volume, "Ma'am, police. Come to the door. I'm going to kick it down." A few seconds later, Officer Lapoint kicked in the door and shot Ms. Jones.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:37–14:23:38. |

| | |
|---|---|
| 52.     Officer Lapoint did not hear anyone call out, scream, or yell. At no point did anyone inside the apartment respond to Officer LaPoint's commands to open the door. Officer Lapoint could only hear the violent struggle.<br><br>**EVIDENCE**:<br>   • **EXH 2,** *Officer LaPoint's Depo* at pg:ln 63:21-64:21; 68:23-69:3<br>     attached to *Cook Decl.* ¶2.<br>   • **EXH 3,** *Smith Depo.* at pg:ln 33:8- 34:21 attached to *Cook Decl.* ¶3; | **Disputed** that Officer Lapoint heard the sounds of a violent struggle.<br><br>No loud noises were made while Mr. Bingham was holding Ms. Jones down. No objects were thrown or hit the floor while Mr. Bingham was holding Ms. Jones down.  No person hit the floor or struggled on the floor while Mr. Bingham was holding Ms. Jones down. There was no screaming or yelling from either Ms. Jones or Mr. Bingham while he was holding Ms. Jones down.<br><br>Jones Decl. ¶ 6.<br><br>The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 29:16–30:5.<br><br>Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment.<br><br>Ex. B to Le Decl., Smith Dep. 30:2–5.<br><br>The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body-worn camera audio. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 28:10–17.<br><br>Further **disputed** to the extent that the absence of screaming or yelling would have led a reasonable officer to conclude that the threat was elevated.<br><br>The absence of screaming, yelling, or talking would not have led a reasonable Police Officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk.<br><br>DeFoe Decl. ¶ 8.<br><br>Further **disputed** to the extent that this suggests Ms. Jones never responded to Officer Lapoint's commands.<br><br>At some point prior to Officer Lapoint kicking the apartment door in, Mr. Bingham let go of Ms. Jones and Ms. Jones made her way to the front door and was in the early process of opening the door when the door was kicked in and she was shot.<br><br>Jones Decl. ¶¶ 6-8. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 53.      Officer Lapoint gave a third warning by banging on the door, announcing police, and warning that he would kick the door open.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 26:15-27:13 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 33:8- 34:21 attached to *Cook Decl.* ¶3;<br>• **EXH. 4**, *RFA1* No. 26 at pg:ln 8:24-9:8 attached to Cook Decl. ¶4;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Disputed** to the extent that Officer Lapoint ever gave a first or second warning that he was going to kick down the door prior to the third knock and announcement and the warning that he would kick the door open.<br><br>When Officer Lapoint arrived at the apartment door, he initially knocked and announced, "Police Department." He then made a second announcement of, "Police Department, come to the door." He then knocked a second time. He then announced, "Ma'am, police, come to the door. I'm gonna kick it down." A few seconds later, Officer Lapoint kicked down the door and intentionally shot Ms. Jones.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:38–14:23:38. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 54.      Officer Lapoint planned that once he breached the door he would position himself back to his point of concealment and reassess his surroundings.<br><br>**EVIDENCE**:<br>　• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 36:17-37:8 attached to *Cook Decl.* ¶2. | **Disputed**. Officer Lapoint did not breach the door and then position himself back to his point of concealment and reassessed.<br><br>After breaching the door, Officer Lapoint intentionally shot Ms. Jones.<br><br>Ex. A to Le Decl., Lapoint Dep. 12:9–25; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:38–14:23:38. |

| 55.    Officer Lapoint was concerned that he would confront an armed or violent subject on the other side of the door.<br><br>**EVIDENCE**:<br>    • **EXH 2,** *Officer LaPoint's Depo* at pg:ln 36:17-37:8; 47:5-21  attached to *Cook Decl.* ¶2. | **Disputed**.<br><br>Prior to arriving at Ms. Jones's apartment, Officer Lapoint and Officer Smith discovered a black backpack containing a firearm in the bushes underneath Ms. Jones's balcony. Officer Lapoint associated the black backpack and gun with the call he was responding to.<br><br>Ex. A to Le Decl., Lapoint Dep. 15:24–16:19.<br><br>The discovery of the black backpack and firearm relating to the call would have informed a reasonable officer acting consistent with standard police officer training and practices that the threat of harm to the Reporting Party had somewhat lessened as the weapon involved in the call was now contained.<br><br>DeFoe Decl. ¶ 5.<br><br>Officer Lapoint believed that the sounds coming from the apartment could be the female victim making a last dash to the door.<br><br>Ex. A to Le Decl., Lapoint Dep. 27:19–28:2, 28:5–9.<br><br>Officer Lapoint believed that the female victim may have been delayed in trying to get to the door.<br><br>Ex. A to Le Decl., Lapoint Dep. 46:5–8. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | If Officer Lapoint reasonably believed that when he kicked/breached the front door, he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources.<br><br>DeFoe Decl. ¶ 9.<br><br>The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence.<br><br>DeFoe Decl. ¶ 10. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 56.    Sometime after third knock and the announcement, "Ma'am please come to the door, I'm gonna kick it down," Mr. Bingham released Plaintiff and allowed Plaintiff to get up from the couch and make her way to the front door.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 37:12-19 attached to *Cook Decl.* ¶1;<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 4:6- 5:16 attached to *Cook Decl.* ¶5; | **<u>Undisputed.</u>** |

| | |
|---|---|
| 57.      During Plaintiff's Second 911 Call, after a minute of warnings, Officer Lapoint kicked open the door and the door propped open about a quarter of the way. | **Disputed** that the door opened only a quarter of the way.<br><br>The door opened halfway before Officer Lapoint shot. |
| **EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 51:23-52-6 attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | Ex. D to Le Decl., Screenshot of Lapoint BWC at 14:23:37; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:33–38.<br><br>Further **disputed** that Officer Lapoint gave multiple warnings that he was going to kick the door in before kicking the door open.<br><br>When Officer Lapoint arrived at the apartment door, he initially knocked and announced, "Police Department." He then made a second announcement of, "Police Department, come to the door." He then knocked a second time. He then announced, "Ma'am, police, come to the door. I'm gonna kick it down." A few seconds later, Officer Lapoint kicked down the door and intentionally shot Ms. Jones.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:38–14:23:38.<br><br>After Officer Lapoint's first knock on the apartment door, he said to Officer Smith *sotto voce*, "We're to boot this door." After Officer Lapoint's second "Police Department" announcement, he again said *sotto voce* to Officer Smith, "I say we fucking boot it, dude." Officer Lapoint then knocked the door for a second and third time, before |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | announcing in a loud volume, "Ma'am, police. Come to the door. I'm going to kick it down." A few seconds later, Officer Lapoint kicked in the door and shot Ms. Jones.

Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:22:37–14:23:38. |
| 58.   As Plaintiff was walking to the door, the Operator on the Second 911 Call asked Plaintiff, "Where did the person go."

**EVIDENCE**:
- **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1;
- **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | **<u>Disputed</u>** to the extent that Ms. Jones was still on the phone with the Operator at the time she was walking to the door and when the Operator as Ms. Jones, "Where did the person go?"

Ms. Jones was on the phone with the 9-1-1 operator prior to the shooting. Once Mr. Bingham released Ms. Jones from his hold on the couch, Ms. Jones left her cell phone on the couch before making my way to my apartment front door. The recording of the second 9-1-1 call captures Ms. Jones's voice fading and trialing at the time she walked away from her cell phone and towards the apartment front door.

Jones Decl. ¶ 7. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 59.     Immediately after the Operator asked Plaintiff, "Where did the person go," Plaintiff said, "He shot me." <br><br> **EVIDENCE**: <br> • **EXH 1,** *Plaintiff's Depo* at pg:ln 72:13-76:25 attached to *Cook Decl.* ¶1; <br> • **EXH. 10,** Second 911 call audio attached to *Cook Decl.* ¶10. | <u>**Disputed**</u> to the extent that Ms. Jones was still on the phone with the Operator when the Operator as Ms. Jones, "Where did the person go?" and Ms. Jones stated, "He shot me." <br><br> Ms. Jones was on the phone with the 9-1-1 operator prior to the shooting. Once Mr. Bingham released Ms. Jones from his hold on the couch, Ms. Jones left her cell phone on the couch before making my way to my apartment front door. The recording of the second 9-1-1 call captures Ms. Jones's voice fading and trialing at the time she walked away from her cell phone and towards the apartment front door. <br><br> Jones Decl. ¶ 7. |

| | |
|---|---|
| 60.     In that quarter opening of the door, immediately after Officer Lapoint kicked the door open, it appeared to him that an unknown person was unexpectedly standing approximately two (2) to three (3) feet in front of him inside of the doorway with their arms outstretched in a shooting stance and he was unexpectedly startled.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 32:15-33:1; 35:25-36:3; 36:17-37:8; attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Disputed**. The door opened halfway and it is clearly visible that Ms. Jones, a black female, is standing at the door wearing a black shirt and green pants and did not have her arms outstretched in a shooting stance.<br><br>The door opened halfway before Officer Lapoint shot.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:33–38.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door.<br><br>*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.<br><br>Officer Lapoint claims he did not see the person's hands before he shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 34:13–17.<br><br>Right above the front door of the apartment is a light shining down so that if someone's standing in the doorway, they are visible.<br><br>Ex. B to Le Decl., Smith Dep. 31:1-3.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint. |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19–54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.<br><br>Jone Decl. ¶ 8.<br><br>Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.<br><br>Jones Decl. ¶ 9. |

| | |
|---|---|
| 61.   There was some light in the hallway directly over Officer Lapoint standing outside the apartment. It was dark inside the apartment.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 32:15-33:1; 35:15-17 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 30:17-31:8 attached to *Cook Decl.* ¶3;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **<u>Disputed</u>** to the extent that this suggests it was too dark inside the apartment for Officer Lapoint to be able to see adequately Ms. Jones standing in front of the door and identify Ms. Jones as an unarmed black female, wearing a black shirt and green pants, who was not making any threatening gesture, when the door was kicked open.<br><br>Right above the front door of the apartment is a light shining down so that if someone's standing in the doorway, they are visible.<br><br>Ex. B to Le Decl., Smith Dep. 31:1-3.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from him when the door opened and when he |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | intentionally fired his gun, intending to strike the person standing at the door.<br><br>*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60. |

| 62. Officer Lapoint could not see the full body of the unknown person on the other side of the door and could not determine the unknown person's race or gender. | **Disputed**. The door opened halfway and it is clearly visible that Ms. Jones, a black female, is standing at the door wearing a black shirt and green pants and did not have her arms outstretched in a shooting stance. |
|---|---|
| **EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 52:7-18; attached to *Cook Decl.* ¶2. | The door opened halfway before Officer Lapoint shot.<br><br>Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:33–38.<br><br>Right above the front door of the apartment is a light shining down so that if someone's standing in the doorway, they are visible.<br><br>Ex. B to Le Decl., Smith Dep. 31:1-3.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door.<br><br>*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green |

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | pants at the time the door was kicked in and when she was shot. |
| | Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50. |
| | Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area. |
| | Jone Decl. ¶ 8. |
| | Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot. |
| | Jones Decl. ¶ 9. |

| | |
|---|---|
| 63.    Officer Lapoint observed what appeared to be an unknown person with their two (2) forearms outstretched towards him. Officer Lapoint was startled and he fired his duty weapon within a second of kicking in the door.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 69:15-22; attached to *Cook Decl.* ¶2;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4; | **Disputed**.<br><br>Right above the front door of the apartment is a light shining down so that if someone's standing in the doorway, they are visible.<br><br>Ex. B to Le Decl., Smith Dep. 31:1-3.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Officer Lapoint claims he did not see the person's hands before he shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 34:13–17.<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.

Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.

Jone Decl. ¶ 8.

Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.

Jones Decl. ¶ 9.

Further **disputed** to the extent that this suggests Officer Lapoint accidentally discharged his firearm as a startle response to Ms. Jones's presence at the door.

Officer Lapoint intentionally pressed the trigger of his gun to fire one shot.

Ex. A to Le Decl., Lapoint Dep. 12:9–17.

Officer Lapoint intended to shoot when he fired his gun.

Ex. A to Le Decl., Lapoint Dep. 12:18–19.

-60-

Case No. 5:22-cv-01764-SSS-SP
PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

When Officer Lapoint fired his gun, he was intending to strike the person behind the door.

Ex. A to Le Decl., Lapoint Dep. 12:20–25.

Further **<u>disputed</u>** to the extent this suggests Officer Lapoint's use of deadly force was reasonable under the circumstances confronting him at the time.

Officer Lapoint's poor tactical decision to breach the door with his pistol in his hand contributed to his overreaction in using deadly force.

DeFoe Decl. ¶ 11.

A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones.

DeFoe Decl. ¶ 14.

The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot.

DeFoe Decl. ¶ 17.

Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones.

DeFoe Decl. ¶ 18.

This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable measures before resorting to using deadly force.

DeFoe Decl. ¶ 18

Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones.

DeFoe Decl. ¶ 19.

Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in.

DeFoe Decl. ¶ 19.

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 64.     Officers then immediately offered medical assistance to Plaintiff.<br><br>**EVIDENCE**:<br>• **EXH 2,** *Officer LaPoint's Depo* at pg:ln 57:20-24 attached to *Cook Decl.* ¶2;<br>• **EXH 3,** *Smith Depo.* at pg:ln 51:10-52:11 attached to *Cook Decl.* ¶3;<br>• **EXH 7,** Officer Lapoint's body worn camera video footage attached to *Lapoint Decl.* ¶4;<br>• **EXH. 8,** Officer Smith's body worn camera video footage attached to *Smith Decl.* ¶4;<br>• **EXH 9,** Critical Incident Video attached to *Railsback Decl.* ¶3. | **Undisputed.** |

| 65.   At no time did Officer Lapoint threaten Plaintiff in any way.<br><br>**EVIDENCE**:<br>   • **EXH 1,** *Plaintiff's Depo* at pg:ln 124:8-125:3 attached to *Cook Decl.* ¶1.<br>   • **EXH 5,** *ROGS1* No. 2 at pg:ln 8:23-10:6 attached to *Cook Decl.* ¶5. | **<u>Disputed</u>** to the extent that Officer Lapoint's use of deadly force against an unarmed, non-threatening Plaintiff who did not pose an immediate threat of death or serious bodily injury was a threat to Plaintiff.<br><br>The only information Officer Taylor Lapoint received from dispatch regarding the call was that the caller was female and the suspect was a white male, wearing a white t-shirt and black pants, with a black backpack, armed with a handgun, who had walked into the female caller's apartment.<br><br>Ex. A to Le Decl., Lapoint Dep. 65:19–23, 15:12–14, 15:19–23, 18:22–19:2.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from |

him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door.

*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.

Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.

Jone Decl. ¶ 8.

Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.

Jones Decl. ¶ 9.

Officer Lapoint intentionally pressed the trigger of his gun to fire one shot.

Ex. A to Le Decl., Lapoint Dep. 12:9–17.

Officer Lapoint intended to shoot when he fired his gun.

Ex. A to Le Decl., Lapoint Dep. 12:18–19.

When Officer Lapoint fired his gun, he was intending to strike the person behind the door.

Ex. A to Le Decl., Lapoint Dep. 12:20–25.

A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones.

DeFoe Decl. ¶ 14.

The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot.

DeFoe Decl. ¶ 17.

Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones.

DeFoe Decl. ¶ 18.

This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | measures before resorting to using deadly force.

DeFoe Decl. ¶ 18

Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones.

DeFoe Decl. ¶ 19.

Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in.

DeFoe Decl. ¶ 19. |

| | |
|---|---|
| 66. At no time did Officer Lapoint intimidate Plaintiff in any way.<br><br>**EVIDENCE**:<br>• **EXH 1,** *Plaintiff's Depo* at pg:ln 124:8-125:3 attached to *Cook Decl.* ¶1.<br>• **EXH 5,** *ROGS1* No. 2 at pg:ln 8:23-10:6 attached to *Cook Decl.* ¶5. | **Disputed** to the extent that Officer Lapoint's use of deadly force against an unarmed, non-threatening Plaintiff who did not pose an immediate threat of death or serious bodily injury was a form of intimidation.<br><br>The only information Officer Taylor Lapoint received from dispatch regarding the call was that the caller was female and the suspect was a white male, wearing a white t-shirt and black pants, with a black backpack, armed with a handgun, who had walked into the female caller's apartment.<br><br>Ex. A to Le Decl., Lapoint Dep. 65:19–23, 15:12–14, 15:19–23, 18:22–19:2.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from |

1  

2  

3  

4  

5  

6  

7  

8  

9  

10  

11  

12  

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28  

him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door.

*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.

Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.

Jone Decl. ¶ 8.

Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.

Jones Decl. ¶ 9.

Officer Lapoint intentionally pressed the trigger of his gun to fire one shot.

Ex. A to Le Decl., Lapoint Dep. 12:9–17.

Officer Lapoint intended to shoot when he fired his gun.

Ex. A to Le Decl., Lapoint Dep. 12:18–19.

| | |
|---|---|
| 1 | When Officer Lapoint fired his gun, he was intending to strike the person behind the door. |
| 2 | |
| 3 | |
| 4 | Ex. A to Le Decl., Lapoint Dep. 12:20–25. |
| 5 | |
| 6 | A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | DeFoe Decl. ¶ 14. |
| 12 | The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | DeFoe Decl. ¶ 17. |
| 19 | |
| 20 | Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones. |
| 21 | |
| 22 | |
| 23 | DeFoe Decl. ¶ 18. |
| 24 | |
| 25 | This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable |
| 26 | |
| 27 | |
| 28 | |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | measures before resorting to using deadly force.<br><br>DeFoe Decl. ¶ 18<br><br>Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones.<br><br>DeFoe Decl. ¶ 19.<br><br>Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in.<br><br>DeFoe Decl. ¶ 19. |

| 67. At no time did Officer Lapoint coerce Plaintiff in any way.<br><br>**EVIDENCE**:<br> • **EXH 1,** *Plaintiff's Depo* at pg:ln 124:8-125:3 attached to *Cook Decl.* ¶1.<br> • **EXH 5,** *ROGS1* No. 2 at pg:ln 8:23-10:6 attached to *Cook Decl.* ¶5. | **<u>Disputed</u>** to the extent that Officer Lapoint's use of deadly force against an unarmed, non-threatening Plaintiff who did not pose an immediate threat of death or serious bodily injury was a form of coercion.<br><br>The only information Officer Taylor Lapoint received from dispatch regarding the call was that the caller was female and the suspect was a white male, wearing a white t-shirt and black pants, with a black backpack, armed with a handgun, who had walked into the female caller's apartment.<br><br>Ex. A to Le Decl., Lapoint Dep. 65:19–23, 15:12–14, 15:19–23, 18:22–19:2.<br><br>Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint.<br><br>Ex. A to Le Decl., Lapoint Dep. 35:25–36:3<br><br>Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot.<br><br>Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50.<br><br>According to Officer Lapoint, Ms. Jones was only two to three feet from |

him when the door opened and when he intentionally fired his gun, intending to strike the person standing at the door.

*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.

Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.

Jone Decl. ¶ 8.

Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.

Jones Decl. ¶ 9.

Officer Lapoint intentionally pressed the trigger of his gun to fire one shot.

Ex. A to Le Decl., Lapoint Dep. 12:9–17.

Officer Lapoint intended to shoot when he fired his gun.

Ex. A to Le Decl., Lapoint Dep. 12:18–19.

When Officer Lapoint fired his gun, he was intending to strike the person behind the door.

Ex. A to Le Decl., Lapoint Dep. 12:20–25.

A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones.

DeFoe Decl. ¶ 14.

The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot.

DeFoe Decl. ¶ 17.

Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones.

DeFoe Decl. ¶ 18.

This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | measures before resorting to using deadly force.<br><br>DeFoe Decl. ¶ 18<br><br>Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones.<br><br>DeFoe Decl. ¶ 19.<br><br>Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in.<br><br>DeFoe Decl. ¶ 19. |

| | | |
|---|---|---|
| 1 | 68.　　At no time did Officer Lapoint treat Plaintiff inappropriately because of her racial status. | **Disputed** to the extent that Officer Lapoint shot an unarmed, non-threatening black female when the description he was provided of the suspect was a white male. |
| 2 | | |
| 3 | | |
| 4 | **EVIDENCE**: | The only information Officer Taylor Lapoint received from dispatch regarding the call was that the caller was female and the suspect was a white male, wearing a white t-shirt and black pants, with a black backpack, armed with a handgun, who had walked into the female caller's apartment. |
| 5 | • **EXH 1,** *Plaintiff's Depo* at pg:ln 124:8-125:3 attached to *Cook Decl.* ¶1. | |
| 6 | | |
| 7 | • **EXH 5,** *ROGS1* No. 2 at pg:ln 8:23-10:6 attached to *Cook Decl.* ¶5. | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | Ex. A to Le Decl., Lapoint Dep. 65:19–23, 15:12–14, 15:19–23, 18:22–19:2. |
| 12 | | |
| 13 | | |
| 14 | | Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint. |
| 15 | | |
| 16 | | Ex. A to Le Decl., Lapoint Dep. 35:25–36:3 |
| 17 | | |
| 18 | | |
| 19 | | Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot. |
| 20 | | |
| 21 | | |
| 22 | | Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50. |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | According to Officer Lapoint, Ms. Jones was only two to three feet from him when the door opened and when he |
| 27 | | |
| 28 | | |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

intentionally fired his gun, intending to strike the person standing at the door.

*See* Defendants' Allegedly Undisputed Fact ("DAUF") #60.

Ms. Jones's left hand was down by her side while her right hand was halfway between her side and the doorknob when the door opened and she was shot. The doorknob was around the height of Ms. Jones's hip area.

Jone Decl. ¶ 8.

Ms. Jones did not have anything in either hand and did not have both arms in an outstretched position at any time between the door being kicked open and when she was shot.

Jones Decl. ¶ 9.

Officer Lapoint intentionally pressed the trigger of his gun to fire one shot.

Ex. A to Le Decl., Lapoint Dep. 12:9–17.

Officer Lapoint intended to shoot when he fired his gun.

Ex. A to Le Decl., Lapoint Dep. 12:18–19.

When Officer Lapoint fired his gun, he was intending to strike the person behind the door.

Ex. A to Le Decl., Lapoint Dep. 12:20–25.

A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones.

DeFoe Decl. ¶ 14.

The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot.

DeFoe Decl. ¶ 17.

Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones.

DeFoe Decl. ¶ 18.

This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable measures before resorting to using deadly force.

DeFoe Decl. ¶ 18

| Defendants' Allegedly Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| | Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones.<br><br>DeFoe Decl. ¶ 19.<br><br>Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in.<br><br>DeFoe Decl. ¶ 19. |

//

//

//

//

//

//

//

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

## PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| **Officer Lapoint Responds to a Call at an Apartment Complex** | |
| 69.     The only information Officer Taylor Lapoint received from dispatch regarding the call was that the caller was female and the suspect was a white male, wearing a white t-shirt and black pants, with a black backpack, armed with a handgun, who had walked into the female caller's apartment. | Ex. A to Le Decl., Lapoint Dep. 65:19–23, 15:12–14, 15:19–23, 18:22–19:2. |
| 70.     Officer Lapoint did not have any information regarding the suspect's age. | Ex. A to Le Decl., Lapoint Dep. 26:13–14. |
| 71.     Officer Lapoint did not have any specific information regarding whether anyone had been injured before he got to the scene. | Ex. A to Le Decl., Lapoint Dep. 18:10–12. |
| 72.     Officer Lapoint was notified that dispatch was attempting to call the female caller back to get more information, but the initial information Officer Lapoint received regarding the call was the only information he had regarding the call. | Ex. A to Le Decl., Lapoint Dep. 26:8–14, 66:10–12. |
| 73.     When Officer Lapoint arrived at the apartment complex, he met up with Officer Smith and thus knew he had a backup officer with him. | Ex. A to Le Decl., Lapoint Dep. 66:23–24. |
| 74.     Officer Lapoint was also aware that additional backup was on the way and that Officer Sklarsky was en route. | Ex. A to Le Decl., Lapoint Dep. 16:20–17:4, 17:20–24. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 75.    As Officer Lapoint and Officer Smith made their way towards the apartment, they discovered a black backpack discarded inside of a bush. | Ex. A to Le Decl., Lapoint Dep. 15:24–16:7. |
| 76.    Officer Smith looked inside the black backpack and discovered a firearm inside. | Ex. A to Le Decl., Lapoint Dep. 16:8–12. |
| 77.    Officer Lapoint associated the discovered black backpack and firearm with the call he was responding to. | Ex. A to Le Decl., Lapoint Dep. 16:13–15. |
| 78.    Prior to reaching the second floor of the apartment complex, Officer Lapoint knew that a black backpack and firearm that may have been associated with the call had been recovered. | Ex. A to Le Decl., Lapoint Dep. 16:4–19. |
| **Officers Lapoint and Smith Attempt to Make Contact with Apartment 214** | |
| 79.    The sounds Officer Lapoint allegedly heard that led him to believe there was a struggle inside the apartment are not the same sounds captured on his body worn camera audio. | Ex. A to Le Decl., Lapoint Dep. 28:10–17. |
| 80.    Officer Lapoint believed that the sounds coming from the apartment could be the female victim making a last dash to the door. | Ex. A to Le Decl., Lapoint Dep. 27:19–28:2, 28:5–9. |
| 81.    Officer Lapoint believed that the female victim may have been delayed in trying to get to the door. | Ex. A to Le Decl., Lapoint Dep. 46:5–8. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 82.    The only sounds Officer Smith heard coming from the apartment was shuffling, like someone could be walking and moving around in the apartment. | Ex. B to Le Decl., Smith Dep. 29:16–30:5. |
| 83.    Based on the shuffling sounds Officer Smith heard, he was unable to tell what movements were happening inside the apartment. | Ex. B to Le Decl., Smith Dep. 30:2–5. |
| 84.    Officer Lapoint made the decision to kick the apartment door in. | Ex. A to Le Decl., Lapoint Dep. 28:18–20. |
| 85.    Before Officer Lapoint kicked the door in, he was aware that Officer Smith was standing behind him, just off to his right, behind a wall. | Ex. A to Le Decl., Lapoint Dep. 28:21–29:2. |
| 86.    Officer Lapoint never discussed a tactical plan or contact-cover configuration with Officer Smith. | Ex. B to Le Decl., Smith Dep. 21:14–21, 23:6–12. |
| 87.    Officer Lapoint did not know where Officer Connor Sklarsky was before he kicked the door in. | Ex. A to Le Decl., Lapoint Dep. 29:3–5. |
| 88.    Before Officer Lapoint kicked the door in, Officer Sklarsky had already arrived on scene and was positioned behind Officer Smith in full view of Officer Lapoint. | Ex. C to Le Decl., Screenshot of Lapoint BWC at 14:23:33; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:32–34. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| **Officer Lapoint Breaches the Front Door and Shoots an Unarmed, Non-Threatening Plaintiff** | |
| 89.    The door opened halfway before Officer Lapoint shot. | Ex. D to Le Decl., Screenshot of Lapoint BWC at 14:23:37; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:33–38. |
| 90.    About one to one and a half seconds elapsed between the time Officer Lapoint breached the door and when he fired a shot. | Ex. A to Le Decl., Lapoint Dep. 31:24–32:3. |
| 91.    Officer Lapoint had his gun in his right hand when he kicked the door open. | Ex. A to Le Decl., Lapoint Dep. 31:21–23. |
| 92.    Officer Lapoint intentionally pressed the trigger of his gun to fire one shot. | Ex. A to Le Decl., Lapoint Dep. 12:9–17. |
| 93.    Officer Lapoint intended to shoot when he fired his gun. | Ex. A to Le Decl., Lapoint Dep. 12:18–19. |
| 94.    When Officer Lapoint fired his gun, he intended to strike the person behind the door. | Ex. A to Le Decl., Lapoint Dep. 12:20–25. |
| 95.    Officer Lapoint claims he did not see a white t-shirt when the door opened. | Ex. A to Le Decl., Lapoint Dep. 70:4–5. |
| 96.    Officer Lapoint claims he did not see the person's hands at any time before he fired. | Ex. A to Le Decl., Lapoint Dep. 34:13–17. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 97.    Officer Lapoint never saw any object, including anything that looked like a phone or a gun, in the person's hand before he fired. | Ex. A to Le Decl., Lapoint Dep. 34:18–23; 36:8–11. |
| 98.    Officer Lapoint does not know whether the person was stationary or moving when he fired. | Ex. A to Le Decl., Lapoint Dep. 33:17–24. |
| 99.    Officer Lapoint did not say anything in between the time he made the decision to kick in the door and when he fired. | Ex. A to Le Decl., Lapoint Dep. 13:13–15, 13:22–24, 32:8–14. |
| 100.    Right above the front door of the apartment is a light shining down so that if someone's standing in the doorway, they are visible. | Ex. B to Le Decl., Smith Dep. 31:1-3. |
| 101.    Ms. Jones was inside the doorway, standing directly in front of the door, when she was shot by Officer Lapoint. | Ex. A to Le Decl., Lapoint Dep. 35:25–36:3. |
| 102.    Ms. Jones is black and female. | Jones Decl. ¶ 10; Ex. A to Le Decl., Lapoint Dep. 54:10–12, 54:19–21. |
| 103.    Ms. Jones was wearing a black shirt and green pants. | Jones Decl. ¶ 10; Ex. A to Le Decl., Lapoint Dep. 54:15–18; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50. |
| 104.    Ms. Jones was clearly visible as a black female wearing a black shirt and green pants at the time the door was kicked in and when she was shot. | Ex. A to Le Decl., Lapoint Dep. 52:19-54:21; Ex. E to Le Decl., Lapoint BWC Screenshot at 14:23:36; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:36–50. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 105.   The height of Ms. Jones's apartment front door doorknob was around the height of her hip area. | Jones Decl. ¶ 8. |
| 106.   Ms. Jone's left hand was down by her side and her right hand was halfway between her side and the doorknob when the door was kicked open and she was shot. | Jones Decl. ¶ 8. |
| 107.   Ms. Jones did not have anything in either hand at the time the door was kicked in and she was shot. | Jones Decl. ¶ 9. |
| 108.   Ms. Jones did not have both arms in an outstretched position at any time between the door being kicked in and when she was shot. | Jones Decl. ¶ 9. |
| 109.   After being shot, Ms. Jones yelled out, "He shot me!" | Jones Decl. ¶ 11; Ex. A to Le Decl., Lapoint Dep. 56:14–17; Ex. 7 to Lapoint Decl., Lapoint BWC Video at 14:23:38–40. |
| 110.   Officer Lapoint knew immediately that the person he had shot was the female caller. | Ex. A to Le Decl., Lapoint Dep. 56:14–17, 58:7–11. |
| 111.   Officer Lapoint never searched Ms. Jones or the black male (Resan Bingham) sitting next to her on the couch. | Ex. A to Le Decl., Lapoint Dep. 56:18–24. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 112.   When Officer Lapoint saw Mr. Bingham sitting next to Ms. Jones on the couch, he assumed that Mr. Bingham was not the suspect because he did not match the report of the suspect. | Ex. A to Le Decl., Lapoint Dep. 59:5–11. |
| **Officer Lapoint's Pre-Shooting Conduct and Use of Deadly Force Violated Standard Police Officer Training and Practices** | |
| 113.   The discovery of the black backpack that contained the gun relating to the call prior to Officer Lapoint and Officer Smith ascending the stairs to apartment 214 and prior to Officer Lapoint breaching the apartment door would have informed a reasonable officer acting consistent with standard police officer training and practices that the threat of harm to the reporting party had somewhat lessened as the weapon involved in the call was now contained. | DeFoe Decl. ¶ 5. |
| 114.   Officer Lapoint made poor tactical decisions, limited his tactical options, and unnecessarily escalated the situation when he left a position of cover and moved by himself and positioned himself at the front of the apartment door. | DeFoe Decl. ¶ 6. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 115.   A reasonable officer acting consistent with standard police training and practices would have formulated a safe tactical plan with the other officers on scene prior from a position of cover before attempting to make contact or breach the apartment door. | DeFoe Decl. ¶ 7. |
| 116.   Officers Lapoint, Smith and Conor Sklarsky violated standard police training and practices when they failed to formulate a safe tactical plan from a position of cover prior to Officer Lapoint positioning himself at the front door of the apartment. | DeFoe Decl. ¶ 7. |
| 117.   A reasonable officer acting consistent with standard police practices and training, confronted with the facts of this incident, would not have made the decision to breach the door at the time Officer Lapoint breached the apartment door. | DeFoe Decl. ¶ 8. |
| 118.   It was not necessary for Officer Lapoint to breach the apartment door at the time that he did because there had not been a report of shot(s) fired at the location at the time of the incident and there were no screams emanating from inside the apartment. | DeFoe Decl. ¶ 8. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 119.   The absence of screaming, yelling, or talking would not have led a reasonable officer acting consistent with standard police officer training and practices to believe that there was an elevated level of risk. | DeFoe Decl. ¶ 8. |
| 120.   If Officer Lapoint reasonably believed that when he kicked/breached the front door, he was going to be possibly confronted with an armed subject, he should not have made the poor tactical decision to kick/breach the door, but rather should have contained the location and requested additional resources. | DeFoe Decl. ¶ 9. |
| 121.   The utilization of Riverside Police Department Special Weapons and Tactics (SWAT) would have been a safer alternative in the event there were armed or potentially armed subjects inside the apartment or if someone was being held hostage and/or being prevent from leaving the residence. | DeFoe Decl. ¶ 10. |
| 122.   Officer Lapoint made a poor tactical decision to kick/breach the front door of the apartment while he had his firearm in his hand. | DeFoe Decl. ¶ 11. |
| 123.   If Officer Lapoint reasonably believed Ms. Jones was in immediate peril, he should have immediately requested a bullhorn, a ballistic shield and breaching tools to include a "ram." | DeFoe Decl. ¶ 11. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 124.   Once a tactical plan was formulated, the respective officer assigned to breach the front door of the apartment would not have his pistol in his or her hand until the door was successfully breached. | DeFoe Decl. ¶ 11. |
| 125.   Officer Lapoint's poor tactical decision to breach the door with his pistol in his hand contributed to his overreaction in using deadly force. | DeFoe Decl. ¶ 11. |
| 126.   If Officer Lapoint decided he was not going to wait for additional resources, he should have formulated a plan with Officers Smith and Sklarsky, who were present at the scene, prior to and at the time Officer Lapoint breached the door. | DeFoe Decl. ¶ 12. |
| 127.   If Officers Smith and Sklarsky had been given specific responsibilities to provide lethal and less lethal cover while Officer Lapoint breached the front door with his pistol holstered, this would have prevented the unnecessary shooting of Ms. Jones. | DeFoe Decl. ¶ 12. |
| 128.   Police Officers are trained to give a verbal warning, when feasible, that deadly force will be used. | DeFoe Decl. ¶ 13. |
| 129.   Officer Lapoint failed to give a verbal warning to Ms. Jones and an opportunity to comply prior to firing his weapon. | DeFoe Decl. ¶ 13. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 130.   A reasonable officer acting consistent with standard police practices would not have used lethal force in the situation confronting Officer Lapoint at the time he used deadly force against Ms. Jones. | DeFoe Decl. ¶ 14. |
| 131.   A reasonable officer acting consistent with standard police training and practices would have taken the time to assess the situation before using deadly force. | DeFoe Decl. ¶ 15. |
| 132.   Officer Lapoint failed to take the time to properly assess the situation before using deadly force, the highest level of force available to peace officers. | DeFoe Decl. ¶ 15. |
| 133.   There was a gross lack of situational awareness in this incident. | DeFoe Decl. ¶ 16. |
| 134.   Officer Lapoint testified that he did not know where Officer Sklarsky was and did not request an update from Officer Sklarsky before breaching the door despite the video from Officer Lapoint's body worn camera showing that Officer Sklarsky was present at the scene and positioned immediately behind Officer Smith prior to Officer Lapoint breaching the door. | DeFoe Decl. ¶ 16. |
| 135.   Police Officers are trained that subjective fear is insufficient to justify using deadly force. | DeFoe Decl. ¶ 17. |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 136.   The objective facts known to Officer Lapoint at the time of the shooting show that Ms. Dezsanee Jones did not present an immediate threat, let alone an immediate threat of death or serious bodily injury to anyone, including Police Officer Taylor Lapoint, at the time she was shot. | DeFoe Decl. ¶ 17. |
| 137.   Officer Lapoint's use of lethal force violated police officer standards and training and caused serious bodily injury to Ms. Jones. | DeFoe Decl. ¶ 18. |
| 138.   Officers are trained that deadly force is the highest level of force an officer can use. | DeFoe Decl. ¶ 18. |
| 139.   Officers are trained that deadly force can only be used as a last resort, if no other reasonable options are available. | DeFoe Decl. ¶ 18; Ex. A to Le Decl., Lapoint Dep. 43:21-25, 44:7-10. |
| 140.   Officers are trained that deadly force should only be used in an Immediate Defense of Life situation. | DeFoe Decl. ¶ 18 |
| 141.   Officers are trained that deadly force is likely to cause great bodily injury or death. | DeFoe Decl. ¶ 18 |
| 142.   Officers are trained that they must show a reverence for human life. | DeFoe Decl. ¶ 18; Ex. A to Le Decl., Lapoint Dep. 44:4-6. |
| 143.   Officers are trained that they are responsible for justifying every shot. | DeFoe Decl. ¶ 18 |

| Plaintiff's Undisputed Fact | Evidence |
|---|---|
| 144.   This was not an Immediate Defense of Life situation and Officer Lapoint had other reasonable measures available and failed to exhaust all other reasonable measures before resorting to using deadly force. | DeFoe Decl. ¶ 18 |
| 145.   Officers are trained to exercise emotional restraint and self-control. | DeFoe Decl. ¶ 19. |
| 146.   Self-control is maintaining composure to make sound judgments and decisions. | DeFoe Decl. ¶ 19. |
| 147.   Officers are also trained that an overreaction in using deadly force is excessive force. | DeFoe Decl. ¶ 19. |
| 148.   Officer Lapoint failed to maintain self-control and overreacted when he used deadly force Ms. Jones. | DeFoe Decl. ¶ 19. |
| 149.   Officer Lapoint's poor tactical decisions, including his decision to breach the door with his pistol in his hand before formulating a safe tactical plan with other police officers on scene, led to his overreaction in intentionally firing firearm at Ms. Jones because he was startled by Ms. Jones's presence at the door at the time the door was kicked in. | DeFoe Decl. ¶ 19. |