# Exhibit A

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4    DEZSANEE JONES,                    )
                                         )
 5                 Plaintiff,            )
                                         )
 6              vs.                      ) Case No.
                                         ) 5:22-CV-1764-SSS-SP
 7    CITY OF RIVERSIDE; TAYLOR LAPOINT; )
      MIKE SMITH; and DOES 1-10,         )
 8    inclusive,                         )
                                         )
 9                 Defendants.           )
      _____)

10

11

12

13

14          REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    TAYLOR LAPOINT

16               FRIDAY, JANUARY 6, 2023

17

18

19

20

21

22

23    Reported By:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:  432537
```

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   DEZSANEE JONES,                       )
                                           )
 5               Plaintiff,                )
                                           )
 6               vs.                       ) Case No.
                                           ) 5:22-CV-1764-SSS-SP
 7   CITY OF RIVERSIDE; TAYLOR LAPOINT;    )
     MIKE SMITH; and DOES 1-10,            )
 8   inclusive,                            )
                                           )
 9               Defendants.               )
     _____)
10

11

12

13

14           The remote videoconference deposition of TAYLOR

15   LAPOINT, taken on behalf of the Plaintiff, beginning at 1:13

16   p.m., and ending at 2:57 p.m., on Friday, January 6, 2023,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2
     For the Plaintiffs:
 3
             LAW OFFICES OF DALE K. GALIPO
 4           BY:  DALE K. GALIPO, ESQ.
             BY:  HANG D. LE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           Tel:  818-347-3333
             Fax:  818-347-4118
 7           E-mail:  dalekgalipo@yahoo.com
             E-mail:  hlee@galipolaw.com
 8

 9   For the Defendants:

10           OFFICE OF THE CITY ATTORNEY-CITY OF RIVERSIDE
             BY:  DEBRA K. COOK, ESQ.
11           3750 University Avenue, Suite 250
             Riverside, California 92501
12           Tel:  951-826-5567
             Fax:  951-826-5540
13           E-mail:

14
     Also Present:  Dezsanee Jones, Judith Gallardo, Avi Melec
15   Vargas, Giana Dibernardo

16

17

18

19

20

21

22

23

24

25
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                    Page 12

```
 1      A.    -- yes, sir.
 2      Q.    So basically I take it your field training probably
 3   ended in 2015?
 4      A.    That would probably be accurate.
 5      Q.    Right.  So from that date to the date of the
 6   shooting incident with Ms. Jones, you would have been
 7   assigned to patrol?
 8      A.    That's correct.
 9      Q.    What type of firearm did you have?
10      A.    A Glock firearm.
11      Q.    Can you be more specific?
12            What type of Glock or what caliber?
13      A.    It was a 17, 9-millimeter, full size handgun.
14      Q.    You fired one shot in the incident?
15      A.    I did.
16      Q.    Did you intentionally press the trigger?
17      A.    I did.
18      Q.    Were you intending to shoot when you fired?
19      A.    I was.
20      Q.    And were you trying to strike a particular person
21   when you fired?
22      A.    I was.
23      Q.    And who were you trying to strike when you fired
24   your shot?
25      A.    The person that was behind the door presenting
```

```
 1    themselves as a threat to me and my life.

 2         Q.   Was that Ms. Jones?

 3         A.   I later found out that that was Ms. Jones.

 4         Q.   Could you tell that it was a black woman before you

 5    fired?

 6         A.   No.

 7         Q.   Could you tell the race of the person before you

 8    fired?

 9         A.   No.

10         Q.   Could you tell whether it was male or female before

11    you fired?

12         A.   No.

13         Q.   In between kicking the door and firing, did you say

14    anything to the person?

15         A.   No.

16         Q.   Did the person say anything to you during that time

17    frame?

18         A.   No.

19         Q.   Did you give the person any verbal warning you were

20    going to fire?

21         A.   No.

22         Q.   Did you give the person any verbal command after you

23    kicked the door?

24         A.   No.

25         Q.   What part of the person's body were you aiming at?
```

```
 1      A.   I do not.

 2      Q.   Do you have any estimate as to the height or weight

 3   of the person?

 4      A.   No.

 5      Q.   Any estimate as to the age of the person?

 6      A.   No.

 7      Q.   Do you know if the person was wearing glasses or

 8   not?

 9      A.   No.

10      Q.   Anything about the person's hairstyle?

11      A.   No.

12      Q.   Did you have information related to the call that a

13   white male was the suspect?

14      A.   I did.

15      Q.   Did the person look to you to be a white male before

16   you fired?

17      A.   I don't know what that person looked like at the

18   second I breached the door.

19      Q.   Did you have information that there may have been a

20   gun involved?

21      A.   I did.

22      Q.   And a black backpack?

23      A.   I did.

24      Q.   And did you have any knowledge before getting to the

25   second floor of the apartment that a black backpack had been
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                    Page 16

1  located?

2      A.   Yes.

3      Q.   How did you learn that?

4      A.   As I arrived on scene I met up with my partner,

5  Officer Smith, and we started making our way towards the

6  apartment.  While he were walking to the apartment inside of

7  a bush, discarded was a black backpack.

8      Q.   And did you associate that black backpack with the

9  call?

10     A.   It was definitely a coincidence that it was there,

11  and Officer Smith looked inside of it, and there was a

12  firearm in it.

13     Q.   So in your mind, did you think that black backpack

14  and firearm was associated with this call?

15     A.   Yes, I did.

16     Q.   And you were aware of the discovery of the black

17  backpack and the gun inside it before you got to the second

18  floor?

19     A.   That's correct.

20     Q.   Did you have any information as to whether backup

21  was on the way?

22     A.   It's -- yes.

23     Q.   What was your understanding in that regard?

24     A.   The way they dispatched the call, the call

25  specifically assigned to me and my beat partner at the time.

1    Officer Smith is not a patrol officer.  So I know that he had

2    responded on his own.  So my partner was still responding to

3    the scene as well.  So I was aware that somebody else was

4    coming.

5        Q.   What did you understand Officer Smith's assignment

6    to be at the time?

7        A.   He works a special assignment different hours than

8    standard patrol.

9        Q.   Who was your partner at the time?

10       A.   I was working alone, a solo patrol car.

11       Q.   I know that.  But I think you said your partner was

12   responding.

13       A.   My general beat partners.  So me working with

14   usually two or three other officers in the assigned areas of

15   the city.

16       Q.   And do you know who those officers were on the day

17   of the incident?

18       A.   I know for sure Officer Sklarsky was one of them.

19          I'm not sure of the other one.

20       Q.   But your understanding is that Sklarsky was in

21   route?

22       A.   That's correct.

23       Q.   And was that communicated over the police radio?

24       A.   Yes.

25       Q.   Did you have any information as to his ETA?

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                    Page 18

```
 1     A.   No.
 2     Q.   And this is probably pretty simplistic, but how did
 3   you know he was in route?
 4          Was it just something communicated over the radio?
 5     A.   It was dispatched two units.  That's kind of how it
 6   goes out.  It goes out to police radio.  Every officer on
 7   duty that day hears it.  But the type of call being a lot
 8   more serious and higher priority usually get a higher officer
 9   response.
10     Q.   Did you have any information that anyone had been
11   specifically injured before you got to the scene?
12     A.   No.
13     Q.   I take it if you would have had that information,
14   you might have called for medical assistance?
15     A.   Just so I'm understanding your question, you know,
16   if -- are we talking like if this whole thing had played a
17   different way and the initial information I received was
18   somebody had been shot or injured?
19     Q.   Correct.
20     A.   Then yes, absolutely.  We probably would have staged
21   medical aid.  That is common.
22     Q.   Did you have information as to whether the caller or
23   the potential victim was a male or female?
24     A.   Female.
25     Q.   That was, again, communicated over the police
```

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                                    Page 19

1    radio?

2         A.   It was.

3         Q.   You had your body-worn camera on at some point; is

4    that correct?

5         A.   Yes, sir.

6         Q.   Where would you carry or position your camera on

7    your person?

8         A.   Center of my chest.

9         Q.   Okay.  And do you know when you turned it on in the

10   chronology of the events on the day of the shooting?

11        A.   I do.  I turned it on after I exited my patrol car

12   and began walking to the apartment.

13        Q.   And you have seen your body-worn camera footage

14   related to the incident?

15        A.   Yes.

16        Q.   How much it of have you watched?

17             In other words, five minutes, ten minutes?

18             Do you know how much of it you actually watched?

19        A.   I watched the entirety.

20        Q.   How long is it, approximately?

21        A.   I don't know, sir.  I would estimate about -- it's a

22   rough estimate.  Like ten to twelve minutes, maybe.

23        Q.   Okay.  And then have you watched any other body-worn

24   camera footage?

25        A.   I have.

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    **Page 26**

```
 1     A.    One time before yes, several years ago.

 2     Q.    What was the nature of that call?

 3     A.    I believe it was like domestic related, but I'm not

 4  sure.  It was more than four years ago.

 5     Q.    You don't recall the details of that call; is that

 6  fair?

 7     A.    I don't.

 8     Q.    Did you have other than it being a white male being

 9  the suspect, did you have any other additional information on

10  the suspect?

11     A.    That he was wearing a white T-shirt, black pants

12  with a backpack and was unknown to the caller.

13     Q.    Did you have anything as to age, for example?

14     A.    No.

15     Q.    When you were coming up the stairs, at some point

16  you made certain announcements; correct?  To the people or

17  person inside of 214?

18     A.    Yes.

19     Q.    And you were -- basically you were not getting a

20  response; is that generally a fair statement?

21     A.    That's correct.

22     Q.    And at some point you decided to kick the door in?

23     A.    I did.

24     Q.    Did you decide to do that, or is that recommended to

25  you to do by someone else?
```

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                                    Page 27

1              How did that occur?

2        A.    Based on the facts that I had and the totality of

3   the circumstances and what I heard inside the apartment after

4   I knocked and announced as the police, I made that decision

5   on my own.

6        Q.    That was your own decision?

7        A.    Yeah.  It was my decision to make, and my partner

8   also had agreed with me.

9        Q.    How had he agreed with you?

10       A.    After he I heard what sounded like a struggle inside

11  the apartment after we knocked and announced, I told my

12  partner, hey, we're going to have to kick the door, and he

13  said okay.

14       Q.    What did you hear regarding a struggle?

15       A.    So after I approached the apartment I kind of took a

16  second to listen to see if I can hear anything, talking,

17  movement, anything, just gathering any type of intel I can to

18  make the best decision with all the information I had.

19              I didn't hear anything, and I was just off to the

20  left of the apartment trying to stay out of that doorway,

21  knocked, announced police, three seconds I didn't hear

22  anything, I stepped back into the point of concealment that

23  I had, a little place of concealment I had, I listened, and

24  from there I heard what sounded like a struggle.

25              At the time what went through my mind was somebody

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                                    Page 28

```
 1    being like held against their will, maybe making a last dash
 2    to the door, and was rolling around on the ground.  It
 3    sounded like a violent struggle.  At that point I thought the
 4    female caller who was inside was in danger.
 5        Q.   When you say making a last dash for the door, you
 6    mean, perhaps, the female victim might have been making a
 7    last dash towards the door?
 8        A.   Possibly.  Ultimately trying to get away from
 9    whoever was in the apartment and was stopped.
10        Q.   Can you hear any of those sounds of the struggle on
11    your body-worn camera?
12        A.   You can.  You can hear sounds on the body camera,
13    yes.
14        Q.   Do they sound to you like a struggle when you listen
15    to the body-worn camera audio?
16        A.   It doesn't sound the same from what I heard the same
17    day, but it does sound odd.
18        Q.   So you eventually kicked the door in; is that
19    correct?
20        A.   I made that decision eventually, yes.
21        Q.   And did you check to see where your backup was
22    before you did that?
23        A.   I partner was standing behind me, Officer Smith.
24        Q.   Smith was standing behind you when you kicked the
25    door open?
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                    Page 29

| 1  | A.   He was about roughly four to five feet behind me |
|----|-------------------------------------------------------|

1      A.   He was about roughly four to five feet behind me

2   just off to what would be my right behind a wall.

3      Q.   How about Sklarsky, did you get an update on where

4   he was at before you kicked the door open?

5      A.   No, sir.

6      Q.   Did you ever consider it might be helpful to have

7   two officers in the area where you kicked the door open so

8   one could be cover?

9      A.   I had cover.  Officer Smith was there.

10     Q.   You believe that Officer Smith could see inside the

11  door when you kicked the door open?

12     A.   No.  Not when I was standing in front of it.

13     Q.   Right.  That's what I'm getting at.

14          Did you consider having a second officer with you in

15  front of the door so when you kicked the door open, that

16  officer would have eyes inside?

17     A.   I'm sorry.  So what you're asking me is should or

18  would I have considered Officer Smith standing directly next

19  to me as I kicked the door?

20     Q.   Or another officer, somebody --

21     A.   Anybody?

22     Q.   Somebody --

23     A.   No, not in this type of situation.

24     Q.   Why not?

25     A.   The layout of the apartment it was -- it would be

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                                    Page 31

1       Q.     You're left-handed?

2       A.     I am.

3       Q.     Why did you have your weapon in your right hand?

4       A.     I do two things with my left hand, and everything

5    else is done by right hand.  I must be cross-dominant or

6    something.  It's really weird.  I don't know.

7       Q.     That's okay.  What do you do -- you confuse me with

8    your last response.

9              What is it that you do with your left hand versus

10   your right hand?

11      A.     Eat and write.

12      Q.     Eat and write.  Okay.

13      A.     I write with my left hand.  Everything else is done

14   with my right hand.

15      Q.     Do you normally have your holster on your right

16   side?

17      A.     Yes.

18      Q.     And so you normally -- your right hand dominant with

19   respect to your firearm?

20      A.     Correct.

21      Q.     Okay.  So you had your firearm in your right hand

22   when you kicked the door open?

23      A.     I did.

24      Q.     And then how much time do you think passed from you

25   kicking the door open to you firing your shot?

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023

Page 32

1       A.    Seconds.

2       Q.    How many?

3       A.    One to one and a half, maybe.

4       Q.    Okay --

5       A.    Maybe less.

6       Q.    Okay.  Sorry.  Did you finish?

7       A.    Yeah.  I said maybe less.

8       Q.    Did you say anything in that time frame from kicking

9    the door to the firing?

10      A.    So from the time I made the decision to kick the

11   door to actually kicking the door, the door opening and then

12   me firing?

13      Q.    Yes.

14      A.    No.

15      Q.    Did you see a person at some point?

16      A.    I did.

17      Q.    And how far was that person from you when you saw

18   the person?

19      A.    Two to three feet, approximately.

20            That's best estimate.

21      Q.    Was there some light in the hallway?

22      A.    There was.  I had a light directly over me.

23      Q.    And when the door opened did some of that light from

24   the hallway go into the apartment?

25      A.    The apartment was dark.  It was just dark beyond

```
 1    after the door opened.

 2         Q.   I'm just wondering if some of the light from the

 3    light above you in the hallway, if you know, went shined into

 4    the apartment when the door was open.

 5         A.   I don't recall.  It happened too fast.

 6         Q.   Did you ever see the person's face before you

 7    fired?

 8         A.   I did not.

 9         Q.   Do you know if the person was stationary or moving

10    when you fired?

11         A.   Difficult to answer.  It was such a rapidly-evolving

12    situation.  After I kicked the door in my mind I have like

13    screenshots, freeze frames of what I saw.  So whether the

14    person was actively moving after I breached the door, I can't

15    say.  It was just too fast.  I have screenshots in my mind of

16    what I saw.  That's about how I want to answer that.

17         Q.   Would it be fair to say you're not sure if the

18    person was stationary or moving?

19         A.   No.  Like I said, she could have been moving, but I

20    just had a snapshot.  She could have been stationary, but I

21    just had a snapshot of what I saw.

22         Q.   Okay.  I'm just saying you're not sure whether the

23    person was stationary or moving; is that fair?

24         A.   I'll agree with you on that.

25         Q.   Okay.  Did you see the person's left hand or arm?
```

```
 1      A.   I saw two arms.

 2      Q.   You did see two arms?

 3      A.   Yes.

 4      Q.   There was enough light to see the arms?

 5      A.   I don't know if it was light or her standing in the

 6   doorway or what it was, but I saw two forearms.

 7      Q.   Two forearms?

 8      A.   Uh-huh.  That's correct.

 9      Q.   When you say forearms, are you referring to just a

10   portion of the arms?

11      A.   So just to give you a visual, this is what I saw,

12   and minus my hands.  So outstretched forearms.

13      Q.   Okay.  And could you see the hands?

14      A.   No.

15      Q.   Did you ever see the person's hands at any time

16   before you fired?

17      A.   No.

18      Q.   Did you ever see a specific object in the person's

19   hands before you fired?

20      A.   No.

21      Q.   Did you ever specifically identify an object as a

22   gun before you fired?

23      A.   No.

24      Q.   And I think you've already told me this, but you

25   never yelled out gun or drop it or anything like that; is
```

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                          Page 35

```
 1   that correct?

 2       A.   Yes, that's correct.

 3       Q.   Were you stationary or moving when you fired your

 4   shot?

 5       A.   I believe I was stationary.

 6       Q.   Did you --

 7       A.   If I recall.

 8       Q.   Did you break the plane of the opened doorway at

 9   some point after kicked the door in?

10       A.   You're asking if I did I go inside the apartment?

11       Q.   Yeah.  Like if we put an imaginary line on the plane

12   of the doorway like where the door would be before you kicked

13   it, did you enter it at any point before you fired?

14       A.   No.

15       Q.   So were you outside the apartment, you believe, when

16   you fired?

17       A.   Yes, I was outside.

18       Q.   Would that include the gun wherever it was on your

19   person?

20       A.   My firearm, yes.

21       Q.   In other words, was the firearm also outside the

22   plane of the door?

23       A.   It was in my right hand, yes, or outside of the

24   door.

25       Q.   But the woman, the person you shot was inside the
```

1    door when you fired; is that fair?

2        A.    Inside of the doorway standing directly in front of

3    the door.

4        Q.    Did you hear any conversation like it sounded like

5    the person might be on the phone or something at any time

6    before you fired?

7        A.    No, I didn't.

8        Q.    And it sounds like you never saw a phone in the

9    person's hands because you never saw an object or the

10   person's hands; is that correct?

11       A.    That's correct.

12       Q.    And why did you just fire one shot as opposed to

13   multiple shots?

14       A.    So we're responsible for every round that we fire.

15             After I fired that round I was able to quickly

16   reassess, and that threat was no longer a threat.

17       Q.    What did you see in your quick reassessment?

18       A.    After I fired my round -- let's me back up.

19             Stood in front of that doorway expecting an armed or

20   violent encounter on the other side of the door, with the

21   totality of the circumstances that I had, I was in fear for

22   the caller that she might be in danger.  After I kicked the

23   door my plan was to get back to my little position of

24   concealment and reassess.  As I breached the door there was a

25   person standing immediately on the other side of the door

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                    Page 43

1      Q.   But to use deadly force you're trained that it has

2    be an immediate threat of death or serious bodily injury;

3    correct?

4      A.   Typically, that's usually what it is, yeah, but also

5    policy states that we don't -- I don't have to wait to be

6    shot to use that force under the totality of the

7    circumstances with the rapidly-evolving call that was going

8    on.  There's just a lot of factors going on.

9           If you're going into your hypothetical exact

10    imaginary thing of what happened, and I kicked the door open,

11    and she was just standing there doing nothing, and I had the

12    distance and the time to perceive just a female standing

13    there not doing anything, in a perfect world, then yeah, I

14    wouldn't have shot, of course, not.

15           That wasn't my intent to shoot her.

16      Q.   I get that.  But when you went to the academy, you

17    obviously had to study the Learning Domains; correct?

18      A.   That's correct.

19      Q.   And including deadly force?

20      A.   Yes.

21      Q.   And when you went to the academy in 2014, the

22    Learning Domains specified that deadly force was the last

23    resort only to be used in the direst of circumstances.

24           Do you remember that?

25      A.   Yes.  To save my life or somebody else.

```
 1              I haven't read that part of Domain in a very, very

 2        long time since 2014.  So I'm not exactly sure what the

 3        verbiage is.

 4           Q.   Do you recall there being discussion about reverence

 5        for human life?

 6           A.   Of course.

 7           Q.   Do you recall there being discussion in the Learning

 8        Domains when you went to the academy by only using deadly

 9        force if no other reasonable options are available?

10           A.   Of course.

11           Q.   Okay.  Then you would agree at least based on your

12        training, to use deadly force against another human being,

13        there has to be an immediate threat of death or serious

14        bodily injury; it can't just be that you think there is a

15        potential threat.

16              I mean, you're trained that it's got to be an

17        immediate threat of death or serious bodily injury; is that

18        fair?

19           A.   It's got to be what I perceived at the time, and

20        what I perceived at the time was a threat.

21           Q.   But a threat is not enough based on your training;

22        it has to be an immediate threat of death or serious bodily

23        injury, true?

24           A.   What I saw was a 100 percent threat to my life.

25           Q.   So that's why I'm going back to my hypothetical.
```

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                                    Page 46

1    that fair?

2        A.   Outside of what I heard, yes, that's right.

3             I had no idea what was going on in there other than

4    danger.

5        Q.   Right.  I think you said at one point that the

6    person may have been delayed in trying to get to the door;

7    you considered that as a possibility?

8        A.   I believe that to be true, yes.

9        Q.   And that the person was maybe was, you know, trying

10   to get to the door while you were making your request --

11       A.   Well, logically speaking, I was hoping that -- I

12   was -- that's what I imagined.  I imagined that she might be

13   trying to make a dash for the door to get there because I

14   don't know if she was injured or hurt or bleeding out.

15            At that point my number one goal was to save her.

16       Q.   Right.  But what I'm getting at, if you're right, I

17   mean if she was making a dash for the door, by the time you

18   kicked the door open, there she is making her dash, and then

19   you would agree that if she wasn't in some type of a shooting

20   stance, it wouldn't be appropriate just to shoot her because

21   she's making a dash for the door?

22       A.   I don't know if she made here dash for the door or

23   if she had been hurt or injured before or maybe tripped and

24   fell then was bleeding, you know, there is all kinds of

25   hypotheticals we can go into of her making a dash for the

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                    Page 52

1   estimate a door opening, but I could tell you that it did not

2   open all the way.  It didn't even open halfway.

3          It opened maybe about a quarter of a way.

4      Q.   And when you opened, partially opened, that's when

5   you could see a person there?

6      A.   That's correct.

7      Q.   And could you see the person from head to toe?

8      A.   No.

9      Q.   And you're saying you could not see what the person

10  was wearing?

11     A.   No.

12     Q.   And you couldn't tell the race of the person?

13     A.   No.

14     Q.   And you're saying you couldn't tell if it was a

15  white male or not?

16     A.   No.

17     Q.   Is that correct?

18     A.   That's correct.

19     Q.   Okay.  I want to show you Exhibit 1.

20          We're going to try to screen-share, and I believe

21  this was taken from I think your body-worn camera.

22          Let me know if you could see it once we try to put

23  it on the screen.

24          (Exhibit 1 was marked for identification.)

25          MR. GALIPO:  I think Karen is trying to help us with

DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.
Taylor LaPoint on 01/06/2023                          **Page 53**

1    that.  This may take just a moment.

2              I apologize for the delay.

3    BY MR. GALIPO:

4        Q.   Okay.  Can you see that on your screen?

5        A.   Yes.

6        Q.   Do you recognize anything in this image?

7        A.   I recognize me.

8        Q.   What part of you do you recognize?

9        A.   It's my green wristband I was wearing.

10       Q.   And you see the gun in your hand?

11       A.   Yes.

12       Q.   And does this, just looking at the, you know, timing

13   and the Riverside Police Department on this, does this look

14   to be from your body-worn camera?

15       A.   It does.

16       Q.   And if you can tell, does the door look partially

17   opened in this image?

18       A.   I would say that it's not opened all the way.

19       Q.   No.  I asked you does it look partially open?

20       A.   What does partially mean, sir?

21       Q.   Partially means not completely open, just open to

22   some degree.

23       A.   Yes.

24       Q.   Okay.  You already told me that you think it was

25   opened about -- I don't know, quarter of the way,

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
**Taylor LaPoint on 01/06/2023**                                    **Page 54**

1   approximately?

2        A.   Roughly, approximately, I would agree with that.

3        Q.   And would you agree at least in this image we can

4   see the door open to some extent?

5        A.   Yes.

6        Q.   And is this the time frame that you think you fired

7   your shot when the door was opened for that split second?

8        A.   I don't know, sir.  This is just a freeze frame

9   picture.

10        Q.   Right.  And in this image from your body-worn

11   camera, would you at least agree you can see that the person

12   is not a white male?

13        A.   From sitting here today staring at this picture

14   right now, yes, I would agree with you.

15        Q.   Could you also agree that you can see that it

16   appears that the person's wearing some type of green pants?

17        A.   Same answer.  Sitting here today looking at this,

18   yes, I agree with you.

19        Q.   And would you at least agree from looking at this

20   the person appears to be black or African American?

21        A.   Agreed.

22        Q.   And would you also you don't see the person in a

23   shooting stance in this image?

24        A.   It's hard to tell.  There's a piece of wood in the

25   middle of it.  This is just a freeze frame of this exact

**DEZSANEE JONES vs CITY OF RIVERSIDE, ET AL.**
Taylor LaPoint on 01/06/2023                                    Page 56

```
 1    this circumstance is because you never saw a gun?

 2        A.   I didn't see a gun.  That's correct.

 3        Q.   And I think if I understand your testimony

 4    correctly, you're saying you could not see the individual's

 5    hands?

 6        A.   No, not -- just forearms.  I didn't see hands.

 7        Q.   Are you trained as an officer to look at the -- look

 8    for the hands?

 9        A.   Yes.

10        Q.   Were you trying to look at the person's hands?

11        A.   There was no time to look at her hands.

12        Q.   So after you fired the shot and then went to your

13    position, what did you do next?

14        A.   Quickly -- so right after I fired my shot I moved

15    offline.  I heard the female say you shot me.  At that point

16    I made an assumption that that was probably the caller that

17    had just been shot.

18             I opened up the door to the apartment and stepped

19    in, and that's when I saw a black female sitting down on the

20    couch next to a black male.

21        Q.   Did you search her at any time?

22        A.   No.

23        Q.   Search the black male?

24        A.   No.

25        Q.   Did you apologize to her for shooting her?
```

1     A.    I was pulled away by other officers.

2     Q.    Okay.  And then where did you go after you were

3  pulled away by other officers?

4     A.    I stayed in the hallway for a few minutes until get

5  other officers there and watch out for the backpack, and then

6  I walked back out to my car.

7     Q.    How soon did you realize that you shot her and she

8  was unarmed?

9           Was that almost immediate?

10    A.    I don't know if she was armed or not, but I knew

11  immediately that I had shot her.  I mean from -- if what

12  you're asking is when I walked into the apartment she was

13  sitting on the couch, did I see any type of weapon, I did

14  not.

15    Q.    But aren't officers trained that if they think

16  someone's armed or potentially armed, to search them for

17  weapons?

18    A.    Right.  But she was no longer -- she's no longer

19  presenting herself as a threat.  She went and sat down on the

20  couch.  She said she was shot she.  She was a female caller.

21          I made the assumption that she was -- she was the

22  victim who reported this unknown person in the apartment.

23  There -- there was no -- at that point it was no longer about

24  searching her or detaining her.  It was about getting her

25  medical attention from being shot.

```
1              That was going through my mind.
2       Q.   So you didn't feel at that point that she had a gun
3  on her and it was necessary to search her?
4       A.   No.  The threat was gone.
5       Q.   And how about the black female -- sorry -- the black
6  male on the couch, did you feel any need to search him?
7       A.   I was -- there was so much going on at the time that
8  I was trying to process through.  He -- he had told me you
9  shot my girl.  I assumed that he wasn't the suspect as what
10 was reported initially, and then I didn't -- I didn't say
11 anything to him.
12      Q.   Okay.  Which I guess kind of gets back to one of my
13 questions I asked you before the break.
14             I take it if you would have recognized her as a
15 female and put two and two together, and when the door opened
16 that this is the person calling or the victim, then you would
17 not have shot her.
18             But you're saying you couldn't tell whether she was
19 a male or female or what her race was; is that correct?
20      A.   Yeah.  I didn't know who was behind the door.
21      Q.   Right.  But if you had seen her to be a female,
22 knowing the caller was a female, and the suspect was a male
23 white, then I take it that would have been important
24 information?
25      A.   Yes.  I suppose that would be important information.
```

1    the backpack on the first floor?

2        A.    Yep.

3        Q.    Okay.  I think that's all the questions I have.

4             MR. GALIPO:  Debra, do you have any questions for

5    the officer today?

6             MS. COOK:  I do.  I just have one.

7                          EXAMINATION

8    BY MS. COOK:

9        Q.    So Mr. Galipo did a good job of unpacking what

10   happened that day, but what I would like you to do is just

11   kind of -- if you can articulate from beginning to end from

12   the moment that you got the call until you shot, each piece

13   of data that you were processing and the impact that it had

14   on your evaluation of the totality of the circumstances in

15   kind of like a realtime overview, please.

16            COURT REPORTER:  And do it slowly, please.

17            Thank you.

18            THE WITNESS:  Yes, ma'am.

19            Upon initial, you know, getting that dispatch call,

20   it came out as a high priority call; a subject with a gun;

21   female caller; white male suspect wearing a white T-shirt,

22   black pants with a black backpack armed with a handgun; had

23   walked into her apartment.

24            This -- this is significant to me because one,

25   we have an obvious male/female gender.  Males are typically

1    stronger than females.  So, you know, females are usually had

2    a disadvantage.  The second thing that was going through my

3    mind is that this person's unknown and he had just walked

4    into her apartment.  And I have -- I have previous

5    experiences when males have been inside female's apartments

6    and the outcome was -- was not good.

7           And I didn't want to be standing outside the door

8    again if a female was murdered by -- by somebody, by an

9    unknown male.  These are things I'm processing while I'm

10   driving to the call.  I also was notified that dispatch was

11   making call backs to her to get more information, clarifying

12   information, and I received no more information.

13          Once I arrived at the call I was hoping to get some

14   sort of other information because as from the time I get the

15   call to the time I'm arriving at the complex to the time I'm

16   walking up to the door and the time I get to the door, I mean

17   everything is -- everything is rapidly-evolving.  Everything

18   is constantly changing.  My plans are changing.

19          Am I going too fast, or are you okay?

20          MR. GALIPO:  You're doing good.

21          THE WITNESS:  Okay.  I just don't want to go too

22   fast for the reporter.

23          When I arrived at the apartment, I see Officer

24   Smith.  I know I have a backup officer there, and just like

25   hundreds of calls I've been on before, we have to go -- we

```
 1              MR. GALIPO:  Yeah.  Just one.

 2                      EXAMINATION

 3   BY MR. GALIPO:

 4      Q.   When you door opened did you see a white T-shirt?

 5      A.   No.

 6      Q.   That's all I have.

 7           MS. COOK:  Thank you.

 8           I'd like to order a copy of this transcript, Madam

 9   Court Reporter.

10           (Deposition proceeding concluded at 2:57 p.m.)

11                      *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           CERTIFICATE

 2                               OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8           That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15           Further, that the foregoing is an accurate

16    transcription thereof.

17           I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  January 6, 2023.

23

24           _____
             Jinna Grace Kim, CSR No. 14151
25
```